**Oscar KAYEMBE, Petitioner**

v.

**John ASHCROFT, Attorney General of the United States, Respondent.**

No. 02–1590.

United States Court of Appeals, Third Circuit.

Argued on Dec. 2, 2002.

July 1, 2003.

Rachelle Abrahami, (Argued), Marguerite Marty, American Friends Service Committee, Immigrant Rights Program, Newark, for Petitioner.

Robert D. McCallum, Assistant Attorney General Civil Division, Linda Wendtland, Assistant Director, Luis E. Perez (Argued), Christopher C. Fuller, John S. Hogan, Trial Attorney, Office of Immigration Litigation Civil Division, U.S. Department of Justice, Washington, Norah A. Schwarz, United States Department of Justice, Office of Immigration Litigation, Washington, for Respondent.

\* The Honorable Richard D. Cudahy, Circuit Court Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

Before ROTH, SMITH, and CUDAHY,\* Circuit Judges.

## OPINION OF THE COURT

CUDAHY, Circuit Judge.

Oscar Kayembe petitions for review of a Board of Immigration Appeals (BIA) decision denying him asylum. Kayembe claims that his Tutsi ethnicity and his father's political detention give him a well-founded fear of future persecution should he be returned to his previous home in the Democratic Republic of Congo. Because the Board of Immigration Appeals failed to make findings concerning Kayembe's credibility and failed to explain how Kayembe had not met his burden of proof for asylum eligibility, this court cannot undertake adequate review of the BIA decision. We therefore vacate the BIA's decision and remand for further proceedings.

I.

The appellant, Oscar Kayembe, was born in Kinshasa, Zaire, on March 18, 1979. Zaire was renamed the Democratic Republic of Congo (DRC) in May of 1997, following an overthrow of its government. Kayembe claims that his mother is of Tutsi ethnicity, and his father is of Luba ethnicity. His parents were divorced when he was nine years old, and he lived with his father, a diamond dealer, prior to his departure from the DRC.

Kayembe claims that his problems in the DRC began in August 1998 when then-president Laurent Desire Kabila began to discriminate against ethnic Tutsis in the DRC. Kayembe testified that, because he was part-Tutsi, he was subject to constant verbal abuse in his community and that government officials periodically subjected

him to search, harassment and interrogation at his home. Kayembe further claims that after enrolling in a DRC university in September 1998, he was forced to leave the school in January 1999 due to persecution from peers and the faculty.

In January 2001, Kabila was assassinated, and his son, Joseph Kabila, became president of the DRC. Following the assassination, the DRC government sought out and detained persons suspected of having knowledge of, or involvement in, the assassination. Kayembe testified that in March 2001 he discovered that his father had been detained by the government. Kayembe also testified that he believed that his father had been detained for being a diamond dealer, and that the government suspected diamond dealers of being connected with the Kabila assassination. Kayembe has had no contact with his father since his father's detention.

Following his father's detention, Kayembe went into hiding. He testified that the DRC government considers family members of its opponents to be enemies, and that that concern caused him to fear for his own safety. With a counterfeit French passport, Kayembe made his way to the United States, where he was detained. He sought asylum, and proceedings on that application followed.

After being denied asylum by an Immigration Judge (IJ), Kayembe appealed to the Board of Immigration Appeals. The BIA denied Kayembe's appeal. This petition for review followed.

## II.

We have jurisdiction to review final orders of the BIA pursuant to 8 U.S.C. § 1252. The Immigration and Naturalization Act (INA) gives to the Attorney General the discretionary power to grant asylum to an alien who qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42)(A).

See 8 U.S.C. § 1158(b)(1). Under § 1101(a)(42)(A) a person becomes eligible for "refugee" status by showing either past persecution or a well-founded fear of future persecution if returned to her prior country of residence based on "race, religion, nationality, membership in a particular social group, or political opinion." Kayembe's claim of refugee status is based on a fear of future persecution derived from his alleged Tutsi ethnicity and the imputation to him of anti-government political opinions via his father's association with the diamond industry in the DRC. See Balasubramanrim v. INS, 143 F.3d 157, 165 n. 10 (3d Cir.1998) (noting that a well-founded fear of persecution may be based on political opinions correctly or incorrectly imputed to the asylum seeker).

Whether or not Kayembe has demonstrated past persecution or a well-founded fear of future persecution is a factual question that we review under the substantial evidence standard. Chen Yun Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir.2002). We will uphold the findings of the BIA to the extent that they are supported by reasonable, substantial and probative evidence on the record considered as a whole, and will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the BIA did. Id.

Our power of review, however, extends only to the decision of the BIA. Abdulai v. Ashcroft, 239 F.3d 542, 548–49 (3d Cir.2001). Therefore, only if the BIA expressly adopts or defers to a finding of the IJ, will we review the decision of the IJ. Id. This principle is relevant here because the BIA made no finding on the issue of Kayembe's credibility. Although the BIA noted that the "Immigration Judge denied the respondent's claim find-

ing that he was not credible," Administrative Record (A.R.) at 2, the BIA made no comment of its own regarding Kayembe's credibility. Nor did the BIA adopt or defer to the IJ's finding on the issue of credibility.[1] We are left, therefore, with no credibility finding to review.

### III.

■ For the purposes of our review the credibility of Kayembe has not been determined. As a practical matter, therefore, we must proceed as if Kayembe's testimony were credible and determine whether the BIA's decision is supported by substantial evidence in the face of his assumed (but not determined) credibility. *See, e.g., Briones v. INS*, 175 F.3d 727, 728–30 (9th Cir.1999) (holding that petitioner's testimony, if credible, was sufficient to support asylum claim and remanding to the BIA for a credibility determination). If the BIA's decision can be found to be supported by substantial evidence, even if Kayembe's testimony is credible, then the absence of a finding on credibility is not significant to the disposition of the case.

### A.

■ Kayembe's first argument contends that the BIA erred in not finding a well-founded fear of future persecution based on his alleged Tutsi lineage. This argument proceeds on two fronts: 1) Kayembe contests the BIA's finding that he has not proved his Tutsi ethnicity; and 2) Kayembe contests the finding that Tutsis are not subject to persecution in the DRC, based on their ethnicity. We will begin with the second part of his argument. Kayembe claims that the BIA failed to consider the record as a whole when it found that country conditions did not support Kayembe's fear of persecution in the DRC as a person of part-Tutsi origin, and that the BIA limited its analysis of persecution to "arrest and detention without charge." When the BIA rejected Kayembe's claim that as a person of part-Tutsi origin he would be subject to persecution, it cited a State Department Country Report that stated, "the government of the Congo is no longer engaged in the practice of arresting and detaining members of the Tutsi ethnic group without charge." A.R. at 3. Even assuming Kayembe to be credible with respect to his Tutsi lineage, the Country Report potentially constitutes substantial evidence to support the BIA's finding. *See, e.g., Lal v. INS*, 255 F.3d 998, 1023 (9th Cir.2001) ("Our case law well establishes 'that the country report from our Department of State is the 'most appropriate' and 'perhaps best resource,' for determining country conditions. As such, the State Department report 'provide[s] substantial evidence for the BIA's determination that the INS successfully rebutted the presumption of future prosecution.'") (citations omitted); *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir.1999) ("In most cases, a State Department report provides ... substantial evidence."). Kayembe claims, however, that the State Department report contains "additional data about the treatment of Tutsis which should have been considered by the BIA since it is indicative of the societal and governmental attitude of Tutsis and the treatment of Tutsis in the DRC." Appellant's Br. at 25.

Kayembe is correct that the State Department Report cuts both ways. The following are some excerpts from the report:

---

1. In this case, the IJ made a fairly detailed analysis of Kayembe's credibility and found his testimony not credible enough, in part due to lack of corroboration, to support his asylum application. A.R. at 90–94.

Violence and discrimination against members of the Tutsi ethnic minority continued; however, the Government protected many Tutsis who were at risk.

\* \* \* \* \* \*

In July 2000, a Belgian Judge issued an arrest warrant against Congolese Foreign Minister Yerodia Abdoulaye after a number of Tutsis in Belgium claimed that Yerodia's radio broadcasts in August 1998 incited the populace to murder Tutsis randomly. A similar case was filed against Laurent Kabila in September 2000.

\* \* \* \* \* \*

The [International Committee of the Red Cross] regularly visited a facility in Kinshasa where the government provides shelter to Tutsis for their own protection.

\* \* \* \* \* \*

The government no longer followed a policy of arresting and detaining members of the Tutsti ethnic group without charge and merely on the basis of their ethnicity. Approximately 300 Tutsis who voluntarily entered a government protection site at the National Social Security Institute in Kinshasa remained there at year's end pending resettlement or reintegration into the community. However, information obtained late in the year indicated that the Government in 1998 arrested approximately 30 Tutsis, who remained in detention in Makala prison at year's end largely because of their ethnicity.

\* \* \* \* \* \*

In April 1999, members of the Presidential Guard arrested Ralph Biteo, because he had the facial features of a Tutsi, and Biteo's cousin Mirimo Mulongo; both were released in August 1999.

\* \* \* \* \* \*

The previous constitutions prohibited discrimination based on ethnicity, sex, or religious affiliation; however, the Government did not enforce these prohibitions effectively and continued to act with prejudice against members of the Tutsi ethnic group. Societal discrimination remained an obstacle to the advancement of certain groups, particularly women, Tutsis, Muslims, and the indigenous Pygmy (Batwa) people.

\* \* \* \* \* \*

Since the start of the war in August 1998, ethnic Tutsis have been subjected to serious abuses, both in the capital and elsewhere, by government security forces and by some citizens for perceived or potential disloyalty to the regime; however, these abuses decreased somewhat during the year.... Human rights groups increasingly complained that the killing of and other human rights violations against Congolese civilians by persons perceived to be of Tutsi ethnicity and their supporters presented an increasing problem. The Government materially supported Mai Mai and Hutu armed groups, which, according to credible reports, repeatedly killed both unarmed and armed Tutsis in areas militarily dominated by antigovernment forces.

U.S. Dep't of State, *Country Reports on Human Rights Practices–2001*, Democratic Republic of the Congo.

Just because the State Department report cuts both ways, however, does not mean that it does not constitute substantial evidence. On the contrary, after reviewing the State Department report, we are left with the impression that a reasonable fact finder *could* find that a Tutsi in the DRC does not have a reasonable fear of persecution based upon his ethnicity.[2]

---

2. We do, however, note that the situation in the DRC is quite fluid, and appears to have

This means that the BIA's decision is supported by substantial evidence; the only circumstance that precludes support by substantial evidence is when " 'any reasonable adjudicator would be *compelled* to conclude to the contrary.' " *Chen Yun Gao*, 299 F.3d at 272 (emphasis added). Because we conclude that the BIA's finding that Tutsis in the DRC are no longer subject to government persecution based on their tribal origin is supported by substantial evidence, we need not consider the BIA's finding that Kayembe failed to prove he was actually a Tutsi.

## B.

 Kayembe's second argument, that the BIA erred in not finding a well-founded fear of future persecution based on political opinions imputed to Kayembe due to his father's status as a diamond dealer, is not disposed of nearly as easily. In the record before the BIA, which included Kayembe's testimony before the IJ, Kayembe asserts: 1) His father is a diamond dealer, A.R. at 82; 2) Diamond dealers in the DRC, such as his father, are assumed to be political opponents of the current regime in power and are therefore targeted for persecution by the government (Kayembe testified that his father was either kidnapped or arrested by the government, A.R. at 84–85, 93); 3) The assumed political opinions of his father are imputed to Kayembe by the DRC government, A.R. at 86–87; and 4) Kayembe fears that he would be a target for government persecution in the DRC because of these imputed

political opinions, A.R. at 86–87. In response to this claim the BIA wrote:

> The respondent also claims to fear persecution on the basis of his father's alleged detention. However, the respondent has failed to meet his burden to show why his father would have been detained. While the respondent claimed that his father was involved in the diamond industry, we are in agreement with the Immigration Judge that the respondent provided scant information about that involvement. Further, even assuming the respondent's father's involvement in the diamond industry, the respondent has not established how, by virtue of his father's involvement, he would suffer persecution on account of a protected ground.

A.R. at 3.

Because the BIA made no findings as to Kayembe's credibility and pointed to nothing in the record that refuted Kayembe's claims, we are faced with this question: If we assume Kayembe to be credible, were the facts that the BIA reviewed such that a reasonable fact finder would be required to conclude that Kayembe had a reasonable fear of persecution were he to be returned to the DRC? We answer this question in the affirmative. Kayembe testified that his father had been detained by the government because of the political beliefs attributed to his father, that the government imputed the same political beliefs to Kayembe, and that he feared a fate similar to his father's should he return to the DRC.[3] If this testimony is assumed

---

taken a turn for the worse during the pendency of this appeal. Serious fighting has apparently broken out in the eastern parts of the country and United Nations forces are being sent to try to stabilize the situation. *See With Congo Truce in Doubt, U.N. Takes Steps to Send Troops*, N.Y. Times, May 17, 2003, at A2. We are confident that, to the extent relevant, the BIA will evaluate ongoing changes

in country conditions in its analysis of Kayembe's case on remand.

3. We do note, with some trepidation, that the allegedly imputed political beliefs were based on the status of Kayembe's father as a diamond dealer. As is widely reported, diamonds from the DRC are "conflict diamonds"–the label given to diamonds sold

credible, there is no way that a reasonable factfinder could reach a conclusion other than that Kayembe had a reasonable fear of persecution based upon imputed political beliefs.

■ It is possible, however, that Kayembe's testimony alone, even if found to be credible, may not meet his burden of proof. "[T]he BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof." *Abdulai,* 239 F.3d at 554. For the BIA to require and consider corroboration, it must conduct a three-part inquiry. *Id.* First, the BIA must identify the facts for which "it is reasonable to expect corroboration." *Id.* In general, "it is 'reasonable' to expect an applicant to corroborate 'facts which are central to his or her claim and easily subject to verification.'" *Id.* (quoting *In re S–M–J,* 21 I. & N. Dec. 722 (BIA 1997), *available at* 1997 WL 80984). Second, the BIA must decide whether an applicant has provided corroboration for the relevant facts. *Id.* Third, as to facts the applicant was unable to corroborate, the BIA must decide whether the applicant adequately explained his failure to corroborate them. *Id.*

There are certainly facts which the BIA may require Kayembe to corroborate. The IJ's decision identifies some of these facts and discusses Kayembe's failure to corroborate them. *See* A.R. at 90–94. The BIA's opinion in this case, however, said nothing about corroboration. Because corroboration is not required in all cases, and because the BIA did not satisfy the threshold requirement of identifying the facts that require corroboration, we will not read a requirement of corroboration into its opinion.

In the end we are left with a situation this court has faced before in *Abdulai*—a BIA decision that fails to make findings on credibility and only asserts petitioner's generic failure to meet his burden of proof. *Abdulai,* 239 F.3d at 551. Unlike *Abdulai,* where the BIA noted a lack of corroboration but failed to adequately explain petitioner's failure to corroborate, the BIA in this case has failed even to provide us with clues that would indicate why or how Kayembe failed to meet his burden of proof. As a result, "the BIA's decision provides us with no way to conduct our (albeit limited) review." *Id.*

## IV.

When deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning. *Id.* at 555. This is the case here, as the BIA's failure either to adopt the IJ's credibility findings

---

outside legitimate channels of commerce for the funding of rebellion and warfare in Africa. *See, e.g.,* Adam Hochschild, *Chaos in Congo Suits Many Parties Just Fine,* N.Y. Times, April 20, 2003, at D3; Tosin Sulaiman, *Law to Curb 'Conflict Diamond' Trade,* Philadelphia Inquirer, May 18, 2003, at A10; Douglas Farah, *Digging Up Congo's Dirty Gems,* Wash. Post, Dec. 20, 2001, at A1. We wonder whether persecution as a result of a diamond dealer's dispute with government forces over control of diamond resources would be proper grounds for asylum. However, Kayembe himself is not a diamond dealer, nor does the record indicate that the

alleged kidnaping/detention was based on anything other than political views imputed to Kayembe's father based on his status as a diamond merchant (there is nothing to indicate that Kayembe's father directly or indirectly was a combatant in the DRC's civil war or a merchant of conflict diamonds) and subsequently imputed to Kayembe. Therefore, this issue does not affect the outcome of the petition before us in the present case. However, to the extent relevant, we are confident that the BIA will consider this issue on remand in evaluating Kayembe's asylum request.

or to make its own leaves us with too little to review. Therefore, we will GRANT the petition for review, VACATE the BIA's order and REMAND the matter to the BIA for further proceedings consistent with this opinion.