**Not For Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 02-2524

GUILLERMO A. PARA BRAVO,
Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL, AND STEVE FAQUAHARSON,
IMMIGRATION AND NATURALIZATION SERVICE,
Respondents.

ON PETITION FOR REVIEW OF AN ORDER
FROM THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Circuit Judge</u>,
Siler,<sup>*</sup> <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Michael G. Moore</u>, was on brief for petitioner.

<u>Peter D. Keisler</u>, Assistant Attorney General, Civil Division, with whom <u>David M. McConnell</u>, Deputy Director, Office of Immigration Litigation, and <u>Chad N. Boudreaux</u>, Counsel to the Assistant Attorney General, were on brief for respondents.

August 27, 2003

---

<sup>*</sup>Of the Sixth Circuit Court of Appeals, sitting by designation.

**Per Curiam**. Petitioner Guillermo A. Para Bravo, who is a native and citizen of Colombia, petitions for review of a final order of removal issued by the Board of Immigration Appeals (BIA), affirming the immigration judge's (IJ's) denial of his requests for asylum and for withholding of removal. For the reasons that follow, we **AFFIRM** the BIA.

## I. BACKGROUND

In 1994, Bravo entered the United States from Colombia on a visitor's visa. Approximately three years later, and after overstaying his visa, he married a United States citizen. Shortly thereafter his wife filed a visa petition on his behalf, and Bravo concurrently filed an application to adjust his status to that of a lawful permanent resident. The applications were denied after Bravo and his wife failed to appear for an interview. He later indicated that the couple missed the interview because they had separated. After removal proceedings commenced against him, his wife filed another visa petition on his behalf, and Bravo again requested an adjustment of status. That request was withdrawn, however, because he and his wife continued to experience marital difficulties. During this process, Bravo appeared with counsel before an IJ and conceded removability for having remained longer than authorized. Eventually, he filed a formal asylum application with the immigration court, which the court later converted into an application for asylum, withholding of removal, and protection

under the United Nations Convention Against Torture.[1]  Following a hearing, the IJ found Bravo removable as charged and denied his applications.  Subsequently, the BIA dismissed his appeal.

At his asylum hearing, Bravo testified that between 1986 and 1993 he owned and operated three discotheques in Colombia.  Much of Bravo's asylum and withholding-of-removal claims rest on an incident that allegedly occurred in 1989.  According to Bravo, while working in one of his clubs, he observed a man selling (or attempting to sell) drugs to one of his patrons.  After breaking up the buy, Bravo learned that the patron's wife had also been offered drugs in the ladies' restroom by another drug pusher.  Having a zero tolerance drug policy at his discotheques, Bravo called the police, who arrested the two individuals suspected of selling (or attempting to sell) narcotics.

Although he never spoke to or saw the perpetrators after that night, he testified that he believes this incident caused him to become the victim of a "systematic exercise of terror and intimidation," one that lasted several years, and that included: verbal and written threats, vandalism of personal property, the bombing of one of his clubs, a shooting attack in the same club, the burning (or partial burning) of another club, and a drive-by

---

[1] In this review petition, Bravo does not seek relief under the United Nations Convention Against Torture. Accordingly, this claim is waived.  See Mediouni v. INS, 314 F.3d 24, 28 n.5 (1st Cir. 2002) (citation omitted).

shooting in front of one of his clubs that resulted in the death of his porter. According to Bravo, "[t]hese persons [i.e., the drug dealers] were detained by the police, [sic] because I told [on] them. . . . And that's when everything started for me . . . ." After each incident, authorities were called to the scene and an investigation was conducted. For instance, after a small bomb was detonated in one of his clubs, the police placed undercover agents at the targeted club for fifteen or twenty days. Unfortunately, the police were unable to arrest anybody in connection with the bombing, or any other incident for that matter. Although Bravo has no knowledge of who was responsible for these events, it is his suspicion that his misfortunes were connected to the drugs dealers he had arrested. Because of his troubles, Bravo liquidated his first discotheque in 1991, another in 1992, and his last in 1993.

In addition to the problems he experienced with his discotheque businesses, Bravo allegedly experienced extortion from guerrilla groups located in the vicinity of a farm that he owned but did not live on. According to his testimony, when he visited his farm, guerrillas would approach him and ask for money. Although the details of these occurrences are unclear and incomplete in the record, Bravo apparently would not cave in to these requests. Ultimately, he sold his farm at a loss because his farmhand was giving the guerrillas food, cattle, and probably money. It is not clear when the farm was sold.

Bravo arrived in the United States as a visitor in 1994 after spending over a year working on the liquidation of his last discotheque, and also attempting to collect unpaid loans owed to him. Also, his departure from Colombia was not until approximately one year and six months after the last known incident in which any attempt was made on his life or any harm was inflicted upon him through his property or those associated with him. When he left, Bravo apparently believed that if he distanced himself from Colombia for a period of time, people were going to "forget" about him and things were going to "calm down" so that he could eventually return home. However, since arriving in the United States, Bravo allegedly has been told by his two daughters, who remain in Colombia, that they have received a phone call from an unidentified person who has indicated that people are aware that Bravo has left the country, and that they would "finish with [him]" if he returned to Colombia.

Although the IJ found Bravo's testimony to be credible, she nonetheless determined that he was not eligible for asylum for two reasons. First, she concluded that Bravo failed to file his application for asylum within the one-year filing deadline set forth in § 208(a)(2)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158(a)(2)(B). Related to this finding, the IJ also held that Bravo failed to establish either of the two statutory exceptions to the one-year filing period. *See* INA

§ 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D). Second, she also held that Bravo failed to show past persecution or a well-founded fear of future persecution. Thus, the IJ also denied Bravo's claims for both asylum and withholding of removal on the merits.

According to the IJ, the threats and economic harm Bravo endured were not the effects of political persecution, but rather, "on account of a personal dispute with two individuals who were attempting to deal in drugs." She continued, "[Bravo] has not in any way indicated that he stated a political opinion to these individuals, or that this was anything other than retaliation against his causing their arrest." The IJ also found relevant the fact that Bravo did not leave Colombia until after he had liquidated his last discotheque, and attempted to collect debts owed to him, actions that resulted in a delay of approximately a year and six months after the last alleged violent incident. It was the IJ's view that "this is not the behavior of an individual who feels that if he was to remain in Colombia . . . he would continue to have threats made or that he would be at risk for harm." She also found that there was no evidence to establish that Bravo "could not have remained in Colombia [and] either started up a different kind of business which would not be the target of drug dealers, or otherwise worked for somebody else as he had prior to 1986." Thus, the IJ concluded by holding that Bravo "has not established that the [type] of crime that was inflicted upon him

constitutes persecution as defined [by the INA], and he has not established that it is more likely than not [that] . . . if he were to return to Colombia that he would suffer harm of any kind."

The BIA dismissed Bravo's appeal in its entirety, and, in doing so, determined that the IJ had properly concluded that Bravo had not met his burden of proof. Specifically, it found that "even if [Bravo] were to qualify for an exception to the 1 year filing deadline, he has not met his burden of demonstrating his eligibility for asylum or withholding of removal." That is, it determined in the alternative, that even if the application was timely, it would not be sufficient to render Bravo eligible for asylum.

## II. ANALYSIS

We have jurisdiction to review final orders of the BIA pursuant to 8 U.S.C. § 1252. Here, although the IJ found that Bravo's asylum application was untimely, the BIA did not affirm on that basis. Accordingly, we leave for another day the question of whether INA § 208(a)(3), 8 U.S.C. § 1158(a)(3), strips this court of jurisdiction to review administrative decisions made pursuant to 8 U.S.C. § 1158(a)(2). See Kayembe v. Ashcroft, 334 F.3d 231, 235 (3d Cir. 2003) (explaining that "[o]ur power of review . . . extends only to the decision of the BIA . . . [and that] only if the BIA expressly adopts or defers to a finding of the IJ, will we review the decision of the IJ") (internal citation omitted).

BIA determinations of "statutory eligibility for relief from deportation, whether via asylum or withholding of deportation, are conclusive if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Mediouni v. INS, 314 F.3d 24, 26-27 (1st Cir. 2002) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (citation omitted)). "We will not reverse simply because we disagree with the Board's evaluation of the facts." Velasquez v. Ashcroft, 316 F.3d 31, 34 (1st Cir. 2002) (citation omitted). Instead, under the deferential "substantial evidence" standard "if [an alien] seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented [not only supports his petition for relief, but] was so compelling that no reasonable factfinder could fail to find" that he statutorily qualified for asylum and/or withholding of removal. Elias-Zacarias, 502 U.S. at 483-84. It is "the alien [who] bears the burden of establishing eligibility for asylum by proving either past persecution or a well-founded fear of persecution." Velasquez, 316 F.3d at 34. Furthermore, the standard for withholding removal is more stringent than the "well-founded fear" touchstone applicable to an asylum claim. *Id.* at 34 n.2. "[A] petitioner unable to satisfy the asylum standard fails, *a fortiori*, to satisfy the former." Alvarez-Flores v. INS, 909 F.2d 1, 4 (1st Cir. 1990).

In the instant case, the IJ made detailed findings of fact and conclusions of law in connection with her merits review of Bravo's claims of asylum and withholding of removal. The BIA agreed with these on-the-merit determinations. According to the BIA, "[a]ny harm that [Bravo] has suffered and any future danger that he may face stems from his refusal to cooperate with drug dealers. Neither the harm nor the danger is on account of any of the statutorily protected grounds for asylum or withholding of removal."

The BIA's decision was the product of "reasonable, substantial, and probative evidence on the record considered as a whole." Elias-Zacarias, 502 U.S. at 481. Bravo has failed to demonstrate either past persecution or a well-founded fear of future persecution on account of his or her race, religion, nationality, membership in a particular social group, or political opinion. Certainly, he has not demonstrated that the "evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite . . . persecution." *Id.* at 483-84. Accordingly, we find no basis to disturb the BIA's asylum and withholding-of-removal decisions pursuant to the substantial evidence standard of review.

**AFFIRMED.**