**Anton SUHARSO; Yunita Wulansari,**
**Petitioners**

v.

**ATTORNEY GENERAL OF**
**the UNITED STATES,**
**Respondent.**

**No. 07–3123.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) on Sept. 30, 2009.

Filed: Oct. 6, 2009.

---

Elizabeth C. Surin, Esq., Morley, Surin & Griffin, Philadelphia, PA, Elizabeth C. Surin, Esq., for Petitioners.

Sharon M. Clay, Esq., Richard M. Evans, Esq., Thomas W. Hussey, Esq., Holly M. Smith, Esq., Kohsei Ugunori, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: RENDELL, AMBRO, and WEIS, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Anton Suharso and his wife, Yunita Wulansari, petition for review of an order of the Board of Immigration Appeals ("BIA") denying their application for asylum and withholding of removal. The facts in this case reflect a familiar pattern: Christian Indonesians of Chinese descent alleging persecution by Muslim Indonesians. The Immigration Judge ("IJ") concluded, and the BIA agreed, that the intimidation and harassment alleged by petitioners—including an episode in which a gang of Muslims assaulted Suharso with a knife—were not sufficiently severe to constitute persecution. Because we agree that petitioners neither suffered past persecution nor possess a well-founded fear of future persecution on account of their religion or ethnicity, we will deny the petition for review.

Suharso and his wife, Wulansari, are natives and citizens of Indonesia, and are ethnically Chinese Catholics. At the hearing on their application for asylum and withholding of removal, Suharso testified that he suffered verbal harassment and was frequently "stopped or attacked" by Indonesian Muslims, and that, on one occasion in March 2002, a gang of Muslims confronted him on his walk to church, seized and stomped his prayer book, and cut him with a knife—incidents that failed to deter Suharso from attending church. A. 111.

Suharso's experience reflected a wider pattern of aggression toward Chinese Christians by elements of the Muslim community between 2000 and 2002. During that period, Suharso testified that radical Muslims regularly targeted churches: bomb attacks and bomb threats against churches "happen[ed] everywhere." A. 116. An expert retained by petitioners, Dr. Jeffrey Winters, corroborated Suharso's testimony, indicating that on Christmas Eve in 2000, unknown terrorists

bombed or attempted to bomb 34 Christian churches in 10 cities. Episodic rioting, involving attacks on Chinese homes and businesses, continued thereafter in different parts of the country. These attacks, Winters stressed, reflected longstanding animus toward Chinese Christians, perceived as unwelcome outsiders. Winters also described an array of discriminatory laws enforced against ethnically Chinese Indonesians.

Government efforts to stem religious and ethnic violence have had mixed results. Winters opined that the Indonesian government, which has a "severely degraded" legal and security apparatus, has had difficulty controlling fanatical fringes, which continue to terrorize Chinese Christians. A. 221. Suharso testified that his church, for example, was forced to close after the government was unable to protect congregants against Muslim extremists. A second expert retained by petitioners, Jana Mason, noted that crimes against Chinese Christians are rarely prosecuted, and that a "significant risk" of ethnic violence has remained since 1998—the last wave of nationwide looting and rioting—

reflecting the government's inability to stem the "growing militancy of Islam." A. 233–34.

One month after his assault at knifepoint, Suharso and his wife celebrated their honeymoon in the United States. Suharso explained that, "at first it was our intention [to come to the United States] for honeymooning (sic)," but, after touring the country, "we felt the situation in here, we do not want to return." A. 126. After immigration officials discovered that petitioners overstayed their visas, removal proceedings were initiated. Petitioners conceded their removability but sought asylum and withholding of removal.[1] The IJ determined, and the BIA agreed, that Suharso offered credible testimony that he suffered persistent harassment and threats on the basis of his religion and ethnicity, but that the indignities endured, including Suharso's assault in March 2002, fell short of "persecution" under the applicable law.[2] Accordingly, the BIA affirmed the IJ's decision that petitioners were ineligible for asylum and withholding of removal.[3]

On appeal, Suharso makes two arguments—that his due process rights were

---

1. Specifically, Suharso applied for asylum and withholding of removal; Wulansari is a derivative applicant for asylum and also seeks withholding of removal.

2. We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252. *See Briseno–Flores v. Att'y Gen.*, 492 F.3d 226, 228 (3d Cir.2007). Where the BIA substantially adopts the findings of the IJ, as the BIA did here, we review the decisions of both the IJ and the BIA. *He Chun Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir.2004).

3. Under INA § 208(b), the Attorney General has the discretion to grant asylum to "refugees." 8 U.S.C. § 1158(b). Section 101(a)(42)(A) of the INA defines a "refugee" as a person unable to return to her country of "nationality ... because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opin-

ion...." 8 U.S.C. § 1101(a)(42)(A). The alien bears the burden of proof of establishing that he is a refugee and that he has suffered past persecution or has a well-founded fear of persecution. *See* 8 C.F.R. § 1208.13(a). If past persecution is established, then the asylum applicant is presumed to have a well-founded fear of persecution. *See* 8 C.F.R. § 1208.13(b)(1). If the alien cannot show past persecution, he may still establish a well-founded fear of future persecution by demonstrating a subjective fear of persecution, and that a reasonable person in the alien's circumstances would fear persecution if returned to the country in question. *Zubeda v. Ashcroft*, 333 F.3d 463, 469 (3d Cir.2003).

To establish entitlement to withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), the alien must demonstrate a "clear probability" of persecution through the presentation of evidence that it is more likely than not that he would be subject

violated when the BIA failed to make an individualized determination of his eligibility for asylum and withholding of removal;[4] and that the BIA's conclusion that he lacked a well-founded fear of persecution was unsupported by substantial evidence.

■ We easily dispose of Suharso's first argument, finding "sufficient indicia" that the BIA gave "particularized consideration" to his arguments and evidence. *Abdulai v. Ashcroft*, 239 F.3d 542, 550 (3d Cir.2001). The BIA considered—and rejected—Suharso's twin contentions—that the harassment that he endured rose to the level of persecution, and that the IJ failed to consider Winters and Mason's affidavits. In a succinct analysis, the BIA concluded that the fact that Suharso's family continued to reside in Indonesia undermined his claim of persecution, that the IJ adequately addressed Winters' affidavit, and that the IJ's alleged failure to consider Mason's affidavit was not prejudicial. In *Abdulai v. Ashcroft*, we approved a similar analysis by the BIA and rejected petitioner's due process claim. *Id.* We thus dismiss Suharso's constitutional challenge as meritless.

■ Suharso's second argument—that the BIA erroneously concluded that he had not suffered past persecution—also fails.[5] Although the BIA credited Suharso's accounts of extremist attacks on Christian churches, his assault in March 2002, and persistent harassment on account of his religion and ethnicity, the BIA properly concluded that these isolated criminal acts were not sufficiently egregious to constitute "persecution"—a term that we have narrowly defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Lie v. Ashcroft*, 396 F.3d 530, 536 (3d Cir.2005) (quoting *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993)). We believe that our recent decision in *Lie v. Ashcroft*, addressing similar facts, forecloses petitioners' argument. *Id.*

In *Lie*, we considered whether religiously and ethnically motivated violence more severe than that directed at Suharso constituted persecution. *Id.* There, the peti-

---

to persecution if deported. *See Mulanga v. Ashcroft*, 349 F.3d 123, 132 (3d Cir.2003). This is a more demanding standard than the standard for asylum, and, therefore, an alien who fails to establish his eligibility for asylum "necessarily fails to meet the standard of withholding of removal under INA § 241(b)(3)." *Lukwago v. Ashcroft*, 329 F.3d 157, 182 (3d Cir.2003).

4. Although the federal Constitution does not guarantee a right to asylum, aliens facing removal are entitled to due process. *See Sewak v. INS*, 900 F.2d 667, 671 (3d Cir.1990). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quotation marks and citation omitted). In removal proceedings, due process has three elements. *Abdulai v. Ashcroft*, 239 F.3d 542, 550 (3d Cir.2001). An alien: "(1) is entitled to factfinding based on a record produced before the decisionmak-

er and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his [or her] interests." *Id.* (internal citations omitted). Petitioners focus solely on the third element, urging that the BIA did not render an individualized determination of their applications for asylum and withholding of removal.

5. We must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias*, 502 U.S. 478, 480, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We will conclude substantial evidence is lacking only where the evidence "was so compelling that no reasonable factfinder could fail to find the alien eligible for asylum or withholding of removal." *Id.* at 483–84, 112 S.Ct. 812; *see Lie v. Ashcroft*, 396 F.3d 530, 534 n. 3 (3d Cir. 2005).

tioner, a Chinese Christian, asserted a well-founded fear of persecution on account of her religion and ethnicity if removed to Indonesia. Petitioner had left Indonesia in the wake of a nationwide wave of ethnic violence that shook the country in 1998. During this tumultuous period, which witnessed serious and widespread attacks on Chinese-owned businesses and homes, thousands of Chinese were killed, raped, or beaten, and their homes, looted and torched. Petitioner was an unfortunate victim of this violence. In 1997, at the very outset of the turmoil, Muslim Indonesians entered her husband's store and, shouting "Chinese pig," robbed petitioner's husband at knife-point. Several months later, two intruders knocked down the door of petitioner's home, demanding money. Calling petitioner a "Chinese pig" and threatening to burn down her house, the assailants seized her money and jewelry and, when petitioner attempted to defend herself, slashed her left forearm with a knife; the resulting laceration required several stitches. Two years later, in March 2000, petitioner left Indonesia. The BIA concluded, and we agreed, that the acts of robbery and violence directed at petitioner, "while unfortunate and troubling," fell short of "persecution." *Id.* at 536. Adopting the holdings of two other courts of appeals, we stated, "We agree with the Ninth and Tenth Circuits that Lie's account of two isolated criminal acts, perpetrated by unknown assailants, which resulted only in the theft of some personal property and a minor injury, is not sufficiently severe to be considered persecution." *Id.* at 536.

*Lie* strongly supports our conclusion that the violence directed at Suharso does not rise to the level of persecution. *Lie* makes clear that verbal harassment, and isolated criminal acts resulting in minor injuries or property damage, do not rise to the level of persecution. Further, courts have distinguished legal discrimination from persecution.[6] The most significant act of retaliation identified by Suharso—an altercation with Muslim gang members in which his forearm was cut and his prayer book destroyed—was less severe than the repeated acts of violence visited upon Lie and her husband, whose homes and businesses were ransacked, who were twice robbed, beaten, and knifed, and who were told that their home would be torched. And, although some evidence suggests a resurgence of religious violence—specifically, bombings, or threats to bomb, Christian churches—Winters explained that 1998 represented an even more dangerous period for Chinese Christians.[7] Because we determined in *Lie* that the conditions in Indonesia in 1998 did not rise to the level of persecution, the BIA properly found that the smaller, ensuing wave of religious violence did not entitle Suharso to relief.

We also agree with the BIA that Suharso did not demonstrate a well-founded fear of *future* persecution—a requirement satisfied by proof that the petitioner was individually singled out for persecution, or that a pattern or practice of persecution against similarly situated individuals exists.[8] Analyzing the former avenue—whether an individualized risk of persecution exists—the BIA initially credited Su-

---

6. *Sombah v. Mukasey,* 529 F.3d 49, 51 (1st Cir.2008) ("Discrimination in Indonesia does not, without more, qualify a Christina Indonesian national for asylum."); *Pulisir v. Mukasey,* 524 F.3d 302, 308–309 (1st Cir.2008); *Kho v. Keisler,* 505 F.3d 50, 58 (1st Cir.2007); *Susanto v. Gonzales,* 439 F.3d 57, 59–60 (1st Cir.2006).

7. Winters observed, "[T]here has been no massive upsurge of violence against the ethnic Chinese on the scale seen in 1998." A. 221.

8. *Sukwanputra v. Gonzales,* 434 F.3d 627, 637 (3d Cir.2006); *see* 8 C.F.R. § 208.13(b)(2)(iii)(A).

harso's testimony that, after his arrival in the United States, his family received death threats, that his church was demolished by Muslim radicals, and that his home was periodically peppered with rocks. The BIA emphasized, however, that Suharso's family, who was never harmed, stayed in Indonesia.[9] The BIA also observed that Suharso's prior assault was a "random act of violence by street hoodlums"—not an attack directed at him in particular. A. 69. On this record, the BIA concluded—quite appropriately—that Suharso failed to establish an individualized risk of persecution if he returned to Indonesia. *See Lie*, 396 F.3d at 537 (requiring proof that asylum applicant had been "singled out" for persecution). Because Suharso has failed to adduce evidence on appeal "so compelling" that no reasonable factfinder could fail to find that he faced a particularized risk of persecution, we will not disturb the BIA's determination of this issue. *Id.* at 534 n. 3.

Alternatively, Suharso seeks relief based on a pattern or practice of persecution against Chinese Christians. In rejecting petitioner's argument, the BIA discounted Winters' affidavit, which identified a risk of renewed violence toward Chinese Christians, underscored the government's inability to control Muslim radicals, and noted the inadequate prosecution of crimes perpetrated against Chinese Christians. The BIA credited, instead, a State Department report indicating a general reduction in ethnic and religious violence. The BIA also found that the Indonesian government had neither perpetrated nor acquiesced to violence against Chinese Christians, but

rather strove to reduce ethnic tensions—efforts that Suharso himself acknowledged at the removal hearing. Mason noted, moreover, that the Indonesian government had begun to repeal discriminatory laws targeting ethnically Chinese Indonesians.

On appeal, Suharso asserts, however, that ethnic and religious violence escalated, rather than subsided, after 2002. Suharso cites the 2005 International Religious Freedom Report, indicating a doubling in the number of churches attacked over the prior year. Suharso also stresses that a recent State Department report found continued legal discrimination against Chinese Christians, who encounter numerous roadblocks in registering marriages, divorces, and births. Suharso maintains that the BIA erred in giving short-shrift to these reports and to Mason and Winters' affidavits, which suggested a continued risk of ethnic and religious violence.

Notwithstanding Mason and Winters's affidavits, we find substantial evidence to support the BIA's conclusion that there is no widespread pattern or practice of persecution of Chinese Christians, and that the Indonesian government has not condoned or acquiesced to attacks by private actors. To the contrary, the State Department Country Report noted a significant drop in violence towards Chinese Christians and improved respect for religious freedom. Although the Report suggested that the government occasionally tolerated hostilities toward Chinese Christians, it also noted that the government made "significant efforts to reduce interreligious violence." A. 177.[10] The State

9. *Lie,* 396 F.3d at 537 (noting that "when family members remain in petitioner's native country without meeting harm," the "reasonableness of a petitioner's well-founded fear of future persecution is diminished"); *see Krasnopivtsev v. Ashcroft,* 382 F.3d 832, 839 (8th Cir.2004); *Hakeem v. INS,* 273 F.3d 812, 816 (9th Cir.2001).

10. *See Kayembe v. Ashcroft,* 334 F.3d 231, 236 (3d Cir.2003) (noting that just because "the State Department report cuts both ways ... does not mean that it does not constitute substantial evidence").

Department Country Report on Human Rights Practices of 2005 found, similarly, that "Police made stronger efforts to investigate, arrest, and prosecute" acts of religious violence.[11] A. 186. Although the report noted that police, which lacked adequate resources, often failed to stop closures of churches, most closures were temporary. Suharso also testified that the government attempted in good-faith, albeit unsuccessfully, to prevent the closure of his local church and to protect congregants from extremist violence at other houses of worship. Hence, as we recently observed in *Wong v. Att'y Gen.*, "[E]ach of the other circuits to address the issue has declined to find a pattern or practice of persecution of Christian Indonesians of Chinese descent." 539 F.3d 225, 234 (3d Cir.2008) (internal citations omitted). On this record, we cannot say that the evidence is "so compelling that no reasonable factfinder could fail to find the alien eligible for asylum or withholding of removal." *Lie*, 396 F.3d at 534 n. 3.

Our conclusion that Suharso does not face a well-founded risk of future persecution is buttressed by our opinion in *Lie*. There, as discussed, we considered whether the petitioner faced a risk of future persecution in the wake of a wave of ethnic and religious violence—a pandemic that, Winters acknowledged, was more lethal and more widespread than the more recent period of turmoil. Despite the virulence of the 1998 attacks, which we noted produced "significant violence and rioting

against individuals of Chinese origin throughout Indonesia," culminating in the deaths of over one thousand people, *id.* at 533, we agreed with the BIA that the petitioner failed to establish a pattern or practice of persecution of Chinese Christians. Because the climate has improved—not worsened—since 1998, we agree with the BIA that Suharso has failed to demonstrate a risk of future persecution on account of his religion or ethnicity.[12] Accordingly, we conclude that the BIA properly denied petitioners' application for asylum and withholding of removal.

For the foregoing reasons, we will deny the petition for review.

---

11. We have previously observed that the State Department Country Report of 2005 reflects improved treatment of Chinese Christians in Indonesia and a reduction in ethnic tensions. *See Wong v. Att'y Gen.*, 539 F.3d 225, 234 (3d Cir.2008) (noting that State Department Country Report of 2005 documents improved treatment of Chinese Christians in Indonesia); *Budiono v. Mukasey*, 548 F.3d 44, 46 (1st Cir.2008) (finding that the State Department Country Report of 2005, indicating a decrease in discrimination and harassment of ethnic

Chinese, undercuts petitioner's assertion of a pattern and practice of discrimination against Chinese Christians in Indonesia).

12. *See Yunaidi v. Att'y Gen.*, 324 Fed.Appx. 762, 764–65 (11th Cir.2009) (unpublished) (rejecting petitioner's contention that the 1998 wave of ethnic violence, which resulted in destruction of petitioner's church and family business and forced the petitioner to flee, rose to the level of persecution).