**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 20-2983

———————————

EDUARD LYVOVICH ZAVALUNOV,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

———————————

On Petition for Review of a Decision of the
Board of Immigration Appeals
(Agency No. A098-828-559)
Immigration Judge: John B. Carle

———————————

Submitted Under Third Circuit L.A.R. 34.1(a)
on March 21, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*

(Filed: May 26, 2022)

———————————

OPINION[*]

———————————

BIBAS, *Circuit Judge*.

Countries change over time. Oases of tolerance may slide into sectarian strife. But the

reverse is true too: tolerance can blossom in formerly arid deserts. Here, an immigrant

---

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding
precedent.

claims that if he is sent back to his birthplace, he will again endure anti-Semitic violence. But his country has changed, and evidence suggests that he would not suffer those terrors today. His family wanted to testify otherwise, but the government would not let them. Yet their testimony would have made no difference, so we will deny his petition for review.

## I. BACKGROUND

Eduard Lyvovich Zavalunov was born in the Tajik Soviet Socialist Republic. In 1991, when his country left the Soviet Union, war broke out between the government and the Islamist opposition. By the late 1990s, these tensions made Tajikistan a hard place for Zavalunov to practice his Jewish faith. Islamists began stealing Jews' cars and "shooting the drivers right on the spot." AR 251–52.

This rising tide of anti-Semitism hit Zavalunov and his family hard. In 1998, people torched their synagogue. That year, Islamists stormed Zavalunov's high school because the girls "would wear … modern skirts and dresses." AR 255. When Islamists started raping girls, Zavalunov tried to defend one of them, so they slashed his foot. Once he fell to the ground, an Islamist burned his hand with a cigarette, put a dagger to his throat, and warned him: "[T]here is no place for the Jews in this country." AR 257.

Two years later, Islamists barged into Zavalunov's apartment in the Jewish quarter. They started beating his parents and telling them that Jews needed to leave. When his parents resisted, they broke his mother's nose and poured boiling water on his father. Next, they bribed government officials to let them seize and sell the Zavalunovs' business. These terrors drove his father into exile and the rest of the family into hiding.

2

But the terrors recurred. The next year, an Islamist ambushed Zavalunov, stabbing and shooting him before fleeing. By 2006, he had had enough. Zavalunov followed his father to the United States and soon became a lawful permanent resident (green-card holder).

But rather than finding lawful work, Zavalunov defrauded this country for nearly a decade. He paid poor people to take needless medical tests, billed Medicare and Medicaid, and then profited from the reimbursements. All told, Zavalunov conned taxpayers and insurers out of almost $14 million. But the feds caught on eventually. They tried him, convicted him, sent him to prison, and moved to deport (remove) him.

Zavalunov opposed deportation, claiming that he would be tortured if he were returned to Tajikistan. Specifically, he sought deferral of removal under the Convention Against Torture. 8 C.F.R. § 1208.17(a). An immigration judge set a hearing on the issue. But Zavalunov's family members could not testify at the hearing because it was held at Zavalunov's prison and the prison lacked the staff to screen them for COVID. The judge ruled against him, and the Board of Immigration Appeals affirmed. Each noted that, since he had fled Tajikistan, anti-Semitism had plummeted.

Zavalunov now petitions us for review, arguing that barring his witnesses' testimony violated due process and that he will be tortured if he returns. We review the due-process claim de novo and the likelihood-of-torture finding for substantial evidence. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 595–96 (3d Cir. 2003); *Kayembe v. Ashcroft*, 334 F.3d 231, 235

(3d Cir. 2003). And we must uphold the agency's likelihood-of-torture finding if any "reasonable factfinder could conclude as the [Board] did." *Id.* at 234; 8 U.S.C. § 1252(b)(4)(B).

## II. ZAVALUNOV'S PETITION FAILS

First, Zavalunov claims that the government deprived him of due process by barring his family members from testifying at his immigration hearing. True, the law gives him "a reasonable opportunity … to present evidence." 8 U.S.C. § 1229a(b)(4)(B). But even if the Board erred, "it is highly [im]probable that the error … affect[ed] the outcome of the case." *Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011). So any error was harmless.

For one, the parties and immigration judge credited that Zavalunov's family would have corroborated his story. Because he benefitted from their corroboration, their absence did not change the outcome. *Id.* Plus, their testimony would have been irrelevant. The Board never doubted his or his family's past experiences. Rather, it found no proof that he would face similar harm today. The family's evidence about what had happened two decades ago would not have mattered.

Zavalunov also claims that, if he is returned to Tajikistan, he will more likely than not face torture. *See Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 214 (3d Cir. 2017). But the Board ruled that he did not carry his burden of proving that. After all, a 2018 State Department report found "no reports of anti-Semitic acts" recently. AR 390. On the contrary, "[t]he small Jewish community had a place of worship and faced no overt pressure." *Id.* These State Department Reports are "perhaps [the] best resource[s] for determining country conditions." *Kayembe*, 334 F.3d at 235 (internal quotation marks omitted). So we

4

cannot draw a different conclusion on this factual question. *See Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010).

* * * * *

Zavalunov faced horrors because of his faith. Still, the Board had substantial evidence that he likely will not endure them again on his return, and his witnesses would not have spoken to that point. Because we review the Board's factual findings under the deferential substantial-evidence standard, we will deny his petition for review.