

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-19-2005

# Lusingo v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4418

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Lusingo v. Atty Gen USA" (2005). *2005 Decisions.* Paper 596.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/596

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-4418

FIKIRI LUSINGO,

Petitioner

v.

*ALBERTO GONZALES, Attorney General
of the United States,

Respondent

*(Amended pursuant to F.R.A.P. 43(c))

On Petition for Review from the
Board of Immigration Appeals
BIA No. A79-239-847

Argued: March 8, 2005

Before: NYGAARD[1], McKEE and RENDELL, <u>Circuit
Judges</u>

(Opinion filed: August 19, 2005)

---

[1]Judge Richard L. Nygaard, Senior Circuit Judge effective
July 9, 2005.

Stephen J. Spiegelhalter **(Argued)**
Latham & Watkins
555 11th Street, N.W.
Suite 1000
Washington, D.C.  20004

*Attorney for Petitioner*

Christopher C. Fuller
Linda S. Wernery
Douglas E. Ginsburg
John M. McAdams, Jr.
Lyle D. Jentzer, **(Argued)**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

*Attorneys for Respondent*

**OPINION**

McKEE, Circuit Judge

Fikiri Lusingo petitions for review of the decision of the Board of Immigration Appeals affirming the Immigration Judge's denial of asylum.  Although the BIA disagreed with the Immigration Judge's analysis of much of the evidence Lusingo presented during his removal hearing, the BIA ultimately

2

affirmed the IJ's order denying relief. On appeal, Lusingo argues that the BIA's ruling denying his asylum claim is "objectively unreasonable."[2] For the reasons that follow, we agree and we will grant the petition for review and remand for additional proceedings consistent with this opinion.

## I. Background.

Lusingo is a native and citizen of Tanzania. He speaks Swahili, and very little English. On July 23, 2001, when Lusingo was sixteen years old, he entered the United States as a visitor for pleasure in order to participate in the International Boy Scout Jamboree in Fredericksburg, Virginia. His visa allowed him to remain in the United States until January 23, 2002. Prior to coming to the United States, Lusingo lived with both parents and attended school.

However, Lusingo did not remain at the jamboree. Instead, he and two other scouts left the jamboree and went to the home of a relative of one of the boys. They were eventually reported missing, and their disappearance received extensive international media coverage.

---

[2] The BIA also ruled that Lusingo failed to establish that he was eligible for withholding of removal or relief under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"), but allowed him voluntary departure. Lusingo has not petitioned for review of those rulings and his claim for withholding of removal and relief under the CAT is therefore not before us.

When Lusingo learned of the extensive news reports of his disappearance, he became frightened and reported to a police station in Maryland. The police transferred him to the custody of the Immigration and Naturalization Service.[3] During the ensuing INS interrogation, Lusingo expressed fear that he would face persecution if returned home because the extensive media coverage of his disappearance would no doubt have embarrassed the government of Tanzania. Lusingo had come to the United States with hopes of converting his visa into a student visa so that he could remain here and receive an education. He therefore had no reason to fear persecution until the media blitz occurred. The extensive coverage of his disappearance resulted in the broadcast of a substantial amount of unflattering information about the Tanzanian government. This included reports that Lusingo feared his government would retaliate by imprisoning him upon his return home, and by economic retaliation against his family. Reports of the possibility of Lusingo's likely imprisonment upon his return mentioned that "it is common for boys to be sexually exploited while in jail in Tanzania."

---

[3] On March 1, 2003, the INS ceased to exist as an agency within the Department of Justice and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107-296, 110 Stat. 2135 (2002). For the sake of consistency, we will use the term INS to refer both to the historical INS and to the Department of Homeland Security to the extent that it is currently fulfilling duties historically performed by the INS.

Lusingo petitioned for asylum based upon his fear that he would be persecuted upon his return home because the Tanzanian government persecutes people who embarrass it. The testimony Lusingo produced during the ensuing removal hearing before the Immigration Judge included the declaration of Dr. Rakesh Rajani. Dr. Rajani's expertise on human rights in Tanzania was not disputed. His declaration states in part:

> the government [of Tanzania] looks unfavorably on those who they perceive to have embarrassed the government or that simply reflect poorly on the government, especially in the eyes of the international community ... [Lusingo] ... publicly embarrassed the Tanzanian government by disappearing from the Boy Scout Jamboree . . . which led to the involvement of the U.S. authorities and spurred wide spread media coverage both in the United States and in Tanzania. The Tanzanian government does not turn a blind eye to such embarrassing publicity, as it could mar their relationship with Western donors ... if sent back to Tanzania, [Lusingo] is likely to be arrested and interrogated upon arrival, as the Tanzanian government is clearly quite interested in his case, as is shown from its statements to the American and African press. After he is arrested, he may be subject to beatings, indefinite detention, a prolonged trial.

Dr. Rajani also described Tanzanian jails and the type of torture and treatment endured by prisoners. According to his

declaration, this includes: co-mingling of adults and children and the consequent sexual abuse of the children, cells covered with urine and feces, forced manual labor including carrying buckets of human excrement; and lack of due process. Dr. Rajani also explained that, given the unfavorable publicity, Lusingo could be subject to prolonged imprisonment under such conditions without actually being charged with any crime. He recounted an event in 2002 where 120 prisoners were held in a room designed to hold 30. Many of those prisoners died of suffocation. Dr. Rajani's declaration ended with the following statement:

> [Lusingo] is at risk of the aforementioned conditions and abuse even if he is not ultimately convicted of a crime. . . . Fikiri would be held as a remand prisoner, where . . . he would endure appalling conditions and be vulnerable to sexual molestation and abuse by adult prisoners or detainees. Thus, [he] is likely to face abuse notwithstanding the outcome of his case if he is forced to return to Tanzania and is prosecuted.[4]

When asked to describe the attitude of the Tanzanian

---

[4] Dr. Rakjani also offered his eyewitness account of a child that he saw beaten by police. The child had been given a book to attend school, but the police mistakenly believed he had stolen the book, and began beating the child. Dr. Rajani stated that he tried to intercede on behalf of the boy and was himself imprisoned.

government toward those believed to be disloyal, Dr. Rajani responded: "the government takes a very dim view of people who are disloyal. It has very little tolerance from them ... dissent is seen as unpatriotic, it is seen as treacherous, and people who are perceived to have been disloyal to the government are treated very harshly by the government." He also declared that Lusingo's departure from the Boy Scout Jamboree had received "quite a bit of coverage." He lived in Tanzania at the time and recalled "vividly that there was a strong sense in Tanzania that what these young people have done was, was extremely disloyal and you got a palpable sense the government was angry with their actions."

Dr. Rajani opined that it was likely that the Tanzanian government would jail Lusingo upon his return and that he would be mistreated in much the same manner the government treats the street children who are also a source of embarrassment. Dr. Rajani believed that the Tanzanian government was angry, "especially since his situation is so unusual for generating so much media interest in both countries." Dr. Rajani concluded that Lusingo had a "reasonable and legitimate fear of returning to Tanzania," because it was likely that he would be "detained, interrogated, and in that process would be held in prison conditions that would be detrimental to his health and probably life threatening." Dr. Rajani's testimony was not rebutted.

Lusingo also produced a declaration from Loren Landau, Ph.D., a Research Coordinator of the Witwaterstand's Forced Migration Studies Program in Johannesburg, South Africa. Dr. Landau, had first-hand knowledge of prison conditions in

Tanzania. He opined that Lusingo had a "legitimate and reasonable fear of imprisonment if returned to Tanzania, where he would likely be commingled with adults and would certainly face horrific conditions . . . [because] . . . the government continues to act with disproportionate force against individuals or groups who oppose the government or embarrass the government in anyway."

In addition, Lusingo testified credibly about his personal knowledge of police mistreatment of Tanzanian citizens.[5] He said that he had seen prisoners (including those with handicaps) being kicked and beaten with batons. He also testified that his friend was once arrested for "hanging out" on the street. His friend returned home without ever having been charged with any offense and told Lusingo of the conditions he had observed in prison. Lusingo learned that detainees are physically mistreated, denied food and medicine, and often raped by violent homosexual prisoners.

Christopher Nugent, Director of the Commission on

_____

[5]    There was no finding of adverse credibility by the IJ with respect to Lusingo's testimony at the removal hearing. Accordingly, we presume its veracity. Where the alien's credibility is not determined by the BIA, "we must proceed as if [his/her] testimony were credible . . . ". *Kayembe v. Ashcroft*, 334 F.3d 231, 325 (3d Cir. 2003).  Moreover, nothing on this record even suggests that Lusingo's testimony was not credible, and both the IJ and the BIA found that he had a genuine fear of returning home.

Immigration Policy, Practice and Pro Bono of the American Bar Association, also testified at Lusingo's removal hearing. He explained that, while interviewing Lusingo, he had been "struck by how fearful [Lusingo] was of returning to Tanzania after all of the press reports."

Documentary evidence that was admitted corroborated Lusingo's evidence. U.S. State Department Country Reports on Human Rights Practices in Tanzania described that country's jails as being among the worst in Africa. JA. 012-013. The Report also confirmed that the Tanzanian government has little appetite for dissent. *Id*. The human rights record was "poor" and includes arbitrary arrests, torture, beatings, and horrendous prison conditions. *Id.*

## A. The Immigration Judge's Decision.[6]

The IJ found Lusingo's fear of return "subjectively genuine." JA 012. The judge summarized Lusingo's claim as follows:

It is essentially [Lusingo's] contention that once the Tanzanian government became aware that he had disappeared from the scouting jamboree in Virginia and attempted to remain in the United

---

[6] Although we are reviewing the decision of the BIA, not the Immigration Judge, a review of the IJ's reasoning is helpful to our analysis of the BIA's decision since the BIA partially agreed with the IJ's rationale.

States to attend school, it became angry with him for creating such a "media circus." Because of such government embarrassment it will target him for persecution upon his return based on a political opinion imputed to him. In this regard, [Lusingo] avers that his decision to walk away from the jamboree, an event his government permitted him to attend, and his determination to remain in the United States, will be viewed as an adverse imputed political opinion which the government has a history of responding to by acts constituting persecution and/or torture.

J.A. 011.

However, the IJ denied asylum, withholding of removal and relief under the United Nations Convention Against Torture based largely upon his interpretation of Dr. Rajani's testimony. The IJ explained:

An important aspect of Mr. Rajani's testimony . . is that he equated respondent's situation to the Tanzanian government's handling of street children in the cities. . . . these children are an embarrassment to the government, which sometimes files criminal charges against them for vagrancy, or rounds them up and trucks them off to a rural area, where they are released out of sight of the public. . . Of those juveniles who find themselves locked away in prison awaiting trial, they are sometimes jailed with violent criminal

10

predators who rape and otherwise sexually abuse them. [Lusingo] feared that once returned, [he] may well find himself immediately detained with adult prisoners and thus will face all of the shortcomings of the penal system of Tanzania.

J.A. 013. However, the IJ concluded that the evidence established that the Tanzanian government had not targeted *children* for abuse. *Id.* He concluded that, although street children may be harassed, even beaten and jailed "merely [for] being poor and destitute, . . . this is not *per se* persecution . . . nor is it relevant to [Lusingo's] claim". *Id.* The IJ was "unconvinced that [Lusingo's] claim [had] any relevant relationship with the alleged mistreatment of street children in Tanzania." *Id.*, JA014.

The IJ noted that he was only able to find one newspaper article from Tanzania relating to Lusingo's case, and he therefore doubted Dr.Rajani's testimony about the scope of media coverage of Lusingo's disappearance in the Tanzanian and international press. *Id.* The IJ also expressed skepticism that Lusingo's unauthorized presence in the United States under the circumstances presented "would result in persecution," whether or not the Tanzanian government was embarrassed by it. *Id.*, at 15. Finally, the IJ noted Lusingo's claim of future persecution was further undermined by the fact that the Tanzanian government had not retaliated against his parents. Based upon all of these considerations, the IJ denied relief based upon his conclusion that Lusingo had not established a well-founded fear of future persecution.

11

## B. The BIA's Decision.

Although the BIA ultimately affirmed the IJ's denial of relief, it disagreed with several important aspects of the IJ's analysis. The Board held that "the Immigration Judge erred in concluding that there was a lack of evidence relating to the Tanzanian government's sensitivity to adverse publicity generated by [Lusingo's] departure from the jamboree." JA 005. On the contrary, the Board found that Lusingo's departure "received extensive media attention, including media coverage in Tanzania." *Id*. Nevertheless, the BIA affirmed the denial of relief based primarily upon its rejection of Lusingo's analogy to his plight and that of street children in Tanzania. JA. O05.

The BIA reasoned: "[Lusingo's] experts do not have a good analogy of [his] situation, insofar as the mistreatment of street children in Tanzania does not have much relevance to [his] claim. [Lusingo] comes from a stable family, with both parents employed, and he attended school until he left Tanzania. While such media attention may have embarrassed the Tanzanian Government, we do not find that it gives rise to a well-founded fear of persecution." J.A. 005.

The Board also reasoned that the fact that Lusingo's parents had neither been arrested nor harmed even though Lusingo had testified that they knew of his desire to remain in the United States from the outset, undermined Lusingo's claim of a well- founded fear of persecution upon his return home. J.A. 006. The Board thus denied relief, and this Petition for Review followed.

12

## II. DISCUSSION

We have jurisdiction to review final orders of the BIA pursuant to 8 U.S.C. § 1252. We do not review the Immigration Judge's rulings unless adopted by the BIA. *Kayembe*, 334 F.3d at 234. Because the BIA's denial of relief was based on a factual finding, we must affirm it if it is supported by "substantial evidence." *Balasubramanrim,* 143 F.3d at 161. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...." *N.L.R.B. v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939) (internal citations omitted).

As noted above, although the BIA affirmed the IJ's denial of relief, it rejected several of the IJ's findings and adjudicated Lusingo's appeal based upon its independent assessment of the record. We therefore review the BIA's decision to determine if it is supported by substantial evidence in the record.

Under the Immigration and Naturalization Act ("INA"), the Attorney General has discretion to grant asylum to an alien who qualifies as a "refugee." *See* 8 U.S. C. § 1158(b)(1). An alien qualifies as a "refugee" by establishing either past persecution or a well-founded fear of future persecution because of "race, religion, nationality, membership in a particular social group, or political opinion," if returned to his/her prior country

13

of residence. *Kayembe*, 334 F.3d at 234.[7]

The inquiry into whether an alien has established the requisite well-founded fear of future persecution is both subjective and objective. The subjective component is satisfied by proof that the professed fear is genuine. The objective component is satisfied by proof that the alien's subjective fear is reasonable in light of all of the record evidence. *Guo v. Ashcroft*, 386 F.3d 556 (3d Cir. 2004).

Lusingo produced abundant evidence that his fear is genuine, and the subjective component of his claim is not disputed. Rather, the dispute focuses on whether that fear is objectively reasonable. An alien may demonstrate that his/her belief is objectively reasonable by documentary or expert evidence about the conditions in a given country. *Lukwago v. Ashcroft*, 329 F.3d 157, 177 (3d. Cir. 2003). When documentary evidence is lacking, an "applicant's credible, persuasive, and specific testimony may suffice" to establish an objective fear of prosecution. *Id. citing Gomez v. I.N.S.*, 947 F.2d 660, 663 (2d Cir. 1991).

On appeal to the BIA, Lusingo claimed that the IJ applied

---

[7] The IJ reasoned that Lusingo's claim was based on the fact that the Tanzanian government would regard him as being critical of the regime based upon his unfavorable comments and the adverse publicity they generated. The IJ treated this as a claim for refugee status based upon an imputed political opinion, and the BIA did not disagree.

14

the wrong legal standard for asylum because the IJ stated that Lusingo had to prove that he "*would*" face persecution." The BIA disagreed based upon its conclusion that "the record in its entirety reflects that [the IJ] understood and applied the proper standard, . . . [and] considered whether [Lusingo] had established . . . 'a reasonable possibility' of suffering persecution in Tanzania." JA005.

However, the BIA determined that the IJ had "erred in concluding that there was a lack of evidence relating to the Tanzanian government's sensitivity to adverse publicity generated by [Lusingo's] departure from the jamboree." *Id.* Rather, the BIA agreed with Lusingo that "his departure from the boy scouts jamboree received extensive media attention, including media coverage in Tanzania. . . ." *Id.* Nevertheless, the BIA agreed that Lusingo's subjective fear was not objectively reasonable and that he therefore could not satisfy the second part of the asylum inquiry.

The BIA's conclusion that Lusingo's claim was not objectively reasonable was based primarily upon the analogy to street children that also troubled the IJ. The Board explained: [Lusingo's] experts do not have a good analogy to [his] situation, insofar as the mistreatment of street children in Tanzania does not have much relevance to [Lusingo's] claim. [He] comes from a stable family, with both parents employed, and he attended school until he left Tanzania. While such media attention may have embarrassed the Tanzanian Government, we do not find that it gives rise to a well founded fear of persecution. The record does not establish that the media attention . . . will lead to [Lusingo's] persecution.

15

*Id*. The BIA's explanation is puzzling because it totally misses the point of Lusingo's analogy. Lusingo did not claim that he was part of the social group of street children, as the BIA's analysis suggests, or that he was subject to persecution upon his return because the Tanzanian government persecutes children. Rather, he merely introduced evidence of the Tanzanian government's repressive attitude toward street children because they are an embarrassment to the Tanzanian government, and because the government's retaliation for the embarrassment they cause is relevant to the reasonableness of Lusingo's fear that he will be persecuted upon his return because he also embarrassed the government. That testimony, if accepted, is certainly supported by the record, and could establish Lusingo's claim of an objectively reasonable and well-founded fear. Thus, we are at a loss to understand the Board's rejection of it based upon what it apparently interpreted as a poorly conceived attempt to suggest Lusingo was a street child.

We are also at a loss to understand the significance the Board attached to the fact that the Tanzanian government had not retaliated against Lusingo's parents. The Board reasoned, "the lack of repercussion to his family tends to suggest that his family has nothing to fear from the government. We too find the reasonableness of [Lusingo's] fear of persecution is reduced insofar as his family continues to reside unharmed in Tanzania." JA 006. However, as the Board clearly notes, Dr. Rajani testified that Lusingo's family would only be "treated harshly *if the Tanzanian government thought they were party to [his] unauthorized stay in the United States."* Id. at. JA006. Although Lusingo testified that his parents knew of his desire to remain here to seek an education, there is nothing to suggest that

16

the his parents knew he planned to leave the jamboree and stay in the United States when he left Tanzania, or that the media reports suggested they knew, or that the Tanzanian government suspected their complicity. Accordingly, Dr. Rajani's testimony does not suggest that the government's failure to retaliate against Lusingo's parents should undermine the objective reasonableness of Lusingo's fear of retaliation absent further explanation for reaching that conclusion.

There is no dispute that Lusingo's fear of return is genuine. In addition, the BIA accepted the evidence of the repressive and retaliatory nature of the Tanzanian regime as well as the fact that reports of Lusingo's departure from the jamboree reached Tanzania and caused the government embarrassment. Moreover, as noted above, the BIA accepted the IJ's analysis of Lusingo's asylum claim as being based on imputed political opinion criticizing the government. Accordingly, it is difficult for us to determine on this record why Lusingo is not entitled to the asylum he is seeking.

In similar situations, we have granted petitions for review, and remanded the matter for additional explanation of the rationale for denying relief. In *Kayembe,* we granted the petition for review and remanded to the BIA because "'the BIA's decision [provided] us with no way to conduct our (albeit limited) review.'" 334 F.3d at 238. Similarly, in *Dia v. Ashcroft*, 353 F.3d 228, 251 (3d Cir. 2003) (*en banc*), we could not understand the IJ's rationale for denying relief. We stated: "we cannot affirm the IJ's findings and conclusions on the record presented to us, as the reasons she does provide in support of her decision do not logically flow from the facts she

17

considered."

Given the BIA's misinterpretation of Lusingo's evidence about street children, and the unwarranted weight attached to the fact that his parents were not persecuted when the Tanzanian government learned of the unfavorable reports of his departure from the jamboree, the reasons the BIA gave in support of its decision do not logically flow from the facts it considered here either. Accordingly, we will remand to the BIA for further explanation of the basis for its decision. "When deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning." *Kayembe*, 334. F.3d at 238.

Before concluding, we pause to comment on some of the arguments the Attorney General makes in its brief as they reflect a problem which is increasingly common in the growing number of cases coming before us. The Attorney General argues that the absence of "even one news report or letter to the editor" undermines Lusingo's claims regarding the media coverage in Tanzania. Appellee's Br. at 31. This argument is either disingenuous or embarrassingly naive. Given the allegations on this record about the Tanzanian government's reaction to those who embarrass it, no one can seriously suggest that the absence of "letters to the editor" on a topic that may embarrass the regime has any probative value whatsoever. We are therefore both confounded and somewhat puzzled by the suggestion that Lusingo should have introduced "letters to the editor" excerpted from the Tanzanian press to support his claim that his

18

disappearance received publicity in Tanzania.[8]

In a less astonishing but similarly myopic assertion, the Attorney General relies upon statements attributed to the Tanzanian Ambassador to the United States in its attempt to suggest that Lusingo has nothing to fear. The Attorney General argues that some of the articles that Dr. Landau introduced indicated that the "Tanzanian Ambassador was aware that Lusingo . . . [was] hoping to stay in the United States to further [his] education, that the Tanzanian government was consulting with our government about the situation, and that the Tanzanian government had assured the boys' families that they were safe." Appellee's Br. At 29. The Attorney General should appreciate that an ambassador of Tanzania is rather unlikely to make public pronouncements that his/her government persecutes its citizens or retaliates against them for unfavorable publicity in the international press. Thus, it should come as no surprise that the Tanzanian Ambassador managed a diplomatic response to inquiries about Lusingo. It is, however, surprising that anyone would suggest that the ambassador's response proves anything other than his diplomatic acumen.

### III CONCLUSION

For the reasons set forth above, we will grant the petition

---

[8] Moreover, absence of letters to the editor would be of questionable probative value even in the context of the free, open and vigorous press that we enjoy here. It certainly has no probative value here.

19

for review and remand to the BIA for further proceedings consistent with this opinion.