NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0577n.06

Nos. 09-3816, 09-3817, 09-3818

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 17, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| HERRY OMARI KIEGEMWE, | (No. 09-3816) | ) |
| ABRAHAM YUDAS TEMBO, and | (No. 09-3817) | ) |
| A N T H O N Y  R O M A N U S | (No. 09-3818) | ) |
| LUAMBANO, | | ) |
| | | ) On Petition for Review of |
| Petitioners, | | ) an Order of the Board of |
| | | ) Immigration Appeals |
| v. | | ) |
| | | ) |
| ERIC H. HOLDER, JR., Attorney | | ) |
| General, | | ) |
| | | ) |
| Respondent. | | ) |
| _____ | | ) |

**Before: GIBBONS and WHITE, Circuit Judges, and MALONEY,** * **District Judge.**

 **HELENE N. WHITE, Circuit Judge.** Herry Kiegemwe, Abraham Tembo, and Anthony

Luambano (petitioners) petition for review of the decisions of the Board of Immigration Appeals

(BIA) affirming the Immigration Judge's (IJ's) denials of asylum. On appeal, petitioners challenge

the determination that they did not establish an objectively reasonable fear of future persecution. We

grant the petitions for review and **REMAND** to the BIA for additional proceedings consistent with

this opinion.

**I**

---

 *The Honorable Paul L. Maloney, Chief Judge of the United States District Court for the
Western District of Michigan, sitting by designation.

Petitioners, Tanzanian natives and then-teenage Boy Scouts, arrived in the United States along with a fourth teenage scout, Fikiri Lusingo, on valid six-month visas to attend the 2001 International Boy Scout Jamboree in Virginia. The four scouts left the Jamboree before it concluded, were reported missing and were the subject of extensive international press coverage (including coverage that referred to them by name and that labeled them as "disloyal" to Tanzania). They turned themselves in to local police, were incarcerated, and were turned over to federal officials.

The four scouts sought asylum, asserting that they would be subjected to harsh retaliatory treatment for embarrassing the Tanzanian government if forced to return. Lusingo's case proceeded separately in Pennsylvania and was resolved several years before the instant cases. Lusingo appealed the denial of his application for asylum to the Third Circuit, and the court granted the petition for review and remanded. *Lusingo v. Gonzales*, 420 F.3d 193 (3d Cir. 2005). On remand, the BIA reversed itself, concluding "upon further review of the record" that Lusingo was eligible for asylum dependent on required security checks.[1] An IJ later granted Lusingo asylum.

Petitioners' three cases proceeded in tandem before an IJ in Detroit, Michigan. The IJ found petitioners credible and their fear of persecution subjectively reasonable, but concluded that they were ineligible for asylum because their applications were untimely and, alternatively, because they failed to demonstrate that their fear of persecution was objectively reasonable. Several of the IJ's reasons for so concluding had been expressly rejected by the Third Circuit in *Lusingo* and had prompted its remand to the BIA. In the instant cases, the BIA found petitioners' asylum applications timely but

---

[1]Donald Fikiri Lusingo, A 79 239 847-York (BIA Dec. 8, 2005); A.R. 1164.

concluded that substantial evidence supported the IJ's alternate conclusion that petitioners failed to demonstrate an objectively reasonable fear of persecution. The BIA's reasoning mirrored the analysis explicitly rejected by the Third Circuit in *Lusingo*. This court consolidated petitioners' appeals for purposes of argument.

## II - the *Lusingo* case

Lusingo's case figures prominently in petitioners' arguments, and for good reason – petitioners were in all respects similarly situated to Lusingo and presented the same experts as had Lusingo. *See* n.7, *infra.*

On Lusingo's appeal of his affirmative application for asylum, the Third Circuit remanded to the BIA for further explanation of the basis for its decision:

Lusingo petitioned for asylum based upon his fear that he would be persecuted upon his return home because the Tanzanian government persecutes people who embarrass it. The testimony Lusingo produced during the ensuing removal hearing before the [IJ] included the declaration of Dr. Rakesh Rajani. Dr. Rajani's expertise on human rights in Tanzania was not disputed. His declaration states in pertinent part:

the government [of Tanzania] looks unfavorably on those who they perceive to have embarrassed the government or that simply reflect poorly on the government, especially in the eyes of the international community . . . [Lusingo] . . . publicly embarrassed the Tanzanian government by disappearing from the Boy Scout Jamboree . . . which led to the involvement of the U.S. authorities and spurred wide spread media coverage both in the United States and in Tanzania. The Tanzanian government does not turn a blind eye to such embarrassing publicity, as it could mar their relationship with Western donors . . . if sent back to Tanzania, [Lusingo] is likely to be arrested and interrogated upon arrival, as the Tanzanian government is clearly quite interested in his case, as is shown from its statements to the American and African press. After he is arrested, he may be subject to beatings, indefinite detention, a prolonged trial.

Dr. Rajani also described Tanzanian jails and the type of torture and treatment endured by prisoners. According to his declaration, this includes: co-mingling of adults and children and the consequent sexual abuse of the children, cells covered with

urine and feces, forced manual labor including carrying buckets of human excrement; and lack of due process. Dr. Rajani also explained that, given the unfavorable publicity, Lusingo could be subject to prolonged imprisonment under such conditions without actually being charged with any crime. He recounted an event in 2002 where 120 prisoners were held in a room designed to hold 30. Many of those prisoners died of suffocation. Dr. Rajani's declaration ended with the following statement:

> [Lusingo] is at risk of the aforementioned conditions and abuse even if he is not ultimately convicted of a crime . . . . Fikiri would be held as a remand prisoner, where . . . he would endure appalling conditions and be vulnerable to sexual molestation and abuse by adult prisoners or detainees. Thus, [he] is likely to face abuse notwithstanding the outcome of his case if he is forced to return to Tanzania and is prosecuted.

When asked to describe the attitude of the Tanzanian government toward those believed to be disloyal, Dr. Rajani responded: the government takes a very dim view of the people who are disloyal. It has very little tolerance for them . . . dissent is seen as unpatriotic, it is seen as treacherous, and people who are perceived to have been disloyal to the government are treated very harshly by the government." He also declared that Lusingo's departure from the Boy Scout Jamboree had received "quite a bit of coverage." He lived in Tanzania at the time and recalled "vividly that there was a strong sense in Tanzania that what these young people have done was, was extremely disloyal and you got a palpable sense the government was angry with their actions."

Dr. Rajani opined that it was likely that the Tanzanian government would jail Lusingo upon his return and that he would be mistreated in much the same manner the government treats the street children who are also a source of embarrassment. Dr. Rajani believed that the Tanzanian government was angry, "especially since his situation is so unusual for generating so much media interest in both countries." Dr. Rajani concluded that Lusingo had a "reasonable and legitimate fear of returning to Tanzania," because it was likely that he would be "detained, interrogated, and in that process would be held in prison conditions that would be detrimental to his health and probably life threatening." Dr. Rajani's testimony was not rebutted.

Lusingo also produced a declaration from Loren Landau, Ph.D., a Research Coordinator of the Witwaterstand's Forced Migration Studies Program in Johannesburg, South Africa. Dr. Landau [] had first-hand knowledge of prison conditions in Tanzania. He opined that Lusingo had a "legitimate and reasonable fear of imprisonment if returned to Tanzania, where he would likely be commingled with

adults and would certainly face horrific conditions . . . [because] . . . the government continues to act with disproportionate force against individuals or groups who oppose the government or embarrass the government in any way."

. . . .

Documentary evidence that was admitted corroborated Lusingo's evidence. U.S. State Department Country Reports on Human Rights Practices in Tanzania described that country's jails as being among the worst in Africa. The Report also confirmed that the Tanzanian government has little appetite for dissent. The human rights record was "poor" and includes arbitrary arrests, torture, beatings, and horrendous prison conditions.

. . . .

The BIA reasoned: "[Lusingo's] experts do not have a good analogy of [his] situation, insofar as the mistreatment of street children in Tanzania does not have much relevance to [his] claim. [Lusingo] comes from a stable family, with both parents employed, and he attended school until he left Tanzania. While such media attention may have embarrassed the Tanzanian Government, we do not find that it gives rise to a well-founded fear of persecution."

The Board also reasoned that the fact that Lusingo's parents had neither been arrested nor harmed even though Lusingo had testified that they know of his desire to remain in the United States from the outset, undermined Lusingo's claim of a wellfounded [*sic*] fear of persecution upon his return home. The Board thus denied relief, and this Petition for Review followed.

. . . .

The BIA's conclusion that Lusingo's claim was not objectively reasonable was based primarily upon the analogy to street children that also troubled the IJ. The Board explained: ["][Lusingo's] experts do not have a good analogy to [his] situation, insofar as the mistreatment of street children in Tanzania does not have much relevance to [Lusingo's] claim. [He] comes from a stable family, with both parents employed, and he attended school until he left Tanzania. While such attention may have embarrassed the Tanzanian Government, we do not find that it gives rise to a well founded fear of persecution. The record does not establish that the media attention . . . will lead to [Lusingo's] persecution.["]

*Id.* The BIA's explanation is puzzling because it totally misses the point of Lusingo's analogy. Lusingo did not claim that he was part of the social group of street children, as the BIA's analysis suggests, or that he was subject to persecution upon his return because the Tanzanian government persecutes children. Rather, he merely introduced evidence of the Tanzanian government's repressive attitude toward street children because they are an embarrassment to the Tanzanian government, and because the government's retaliation for the embarrassment they cause is relevant to the

5

reasonableness of Lusingo's fear that he will be persecuted upon his return because he also embarrassed the government. That testimony, if accepted, is certainly supported by the record, and could establish Lusingo's claim of an objectively reasonable and well-founded fear. Thus, we are at a loss to understand the Board's rejection of it based upon what it apparently interpreted as a poorly conceived attempt to suggest Lusingo was a street child.

We are also at a loss to understand the significance the Board attached to the fact that the Tanzanian government had not retaliated against Lusingo's parents. The Board reasoned, "the lack of repercussion to his family tends to suggest that his family has nothing to fear from the government. We too find the reasonableness of [Lusingo's] fear of persecution is reduced insofar as his family continues to reside unharmed in Tanzania." However, as the Board clearly notes, Dr. Rajani testified that Lusingo's family would only be "treated harshly *if the Tanzanian government thought they were party to [his] unauthorized stay in the United States*." Although Lusingo testified that his parents knew of his desire to remain here to seek an education, there is nothing to suggest that [] his parents knew that he planned to leave the jamboree and stay in the United States when he left Tanzania, or that the media reports suggested they knew, or that the Tanzanian government suspected their complicity. Accordingly, Dr. Rajani's testimony does not suggest that the government's failure to retaliate against Lusingo's parents should undermine the objective reasonableness of Lusingo's fear of retaliation absent further explanation for reaching that conclusion.

There is no dispute that Lusingo's fear of return is genuine. In addition, the BIA accepted the evidence of the repressive and retaliatory nature of the Tanzanian regime as well as the fact that reports of Lusingo's departure from the jamboree reached Tanzania and caused the government embarrassment. Moreover, as noted above, the BIA accepted the IJ's analysis of Lusingo's asylum claim as being based on imputed political opinion criticizing the government. Accordingly, it is difficult for us to determine on this record why Lusingo is not entitled to the asylum he is seeking.

In similar situations, we have granted petitions for review, and remanded the matter for additional explanation of the rationale for denying relief. In *Kayembe* [*v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003)], we granted the petition for review and remanded to the BIA because "'the BIA's decision [provided] us with no way to conduct our (albeit limited) review.'" Similarly, in *Dia v. Ashcroft*, 353 F.3d 228, 251 (3d Cir. 2003) (*en banc*), we could not understand the IJ's rationale for denying relief. We stated: "we cannot affirm the IJ's findings and conclusions on the record presented to us, as the reasons she does provide in support of her decision do not logically flow from the facts she considered."

6

Given the BIA's misinterpretation of Lusingo's evidence about street children, and the unwarranted weight attached to the fact that his parents were not persecuted when the Tanzanian government learned of the unfavorable reports of his departure from the jamboree, the reasons the BIA gave in support of its decision do not logically flow from the facts it considered here either. Accordingly, we remand to the BIA for further explanation of the basis for its decision. "When deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning." *Kayembe* [*v. Ashcroft*], 334 F.3d [231,] 238 [3d Cir. 2003].

*Lusingo*, 420 F.3d at 195-201 (internal citations to record omitted, emphasis in original).

On remand from the Third Circuit, the BIA reversed itself in an unpublished order per curiam:

[U]pon further review of the record, we find the respondent eligible for asylum, dependent upon the required security checks, and the record does not reflect that a denial of asylum in the exercise of discretion is warranted in this case. *See generally Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996). Accordingly, the decision of the Board in this case dated October 27, 2003, is vacated and the record is remanded to the Immigration Judge for the required security checks . . . .

[Donald Fikiri Lusingo, A 79 239 847-York (BIA Dec. 8, 2005); A.R. 1164.] Subsequently, an IJ

granted Lusingo asylum.

### III - Petitioners' appeals to the BIA

In three substantially identical[2] opinions, the BIA determined that the instant petitions were

timely, but that substantial evidence supported the IJ's conclusion that petitioners are ineligible for

asylum because they failed to establish an objective fear of persecution. Finding the IJ's reasoning

more persuasive than the Third Circuit's reasoning in *Lusingo*, the BIA agreed with the IJ that: 1) "the

Tanzanian government's poor treatment of street children or of student demonstrators provides little

---

[2]Differences in the BIA's three decisions are found at 2, n. 2; 3 (last paragraph); 4 (1st full paragraph). Luambano J.A. at 7-11/ A.R. 3-7; Tembo J.A. at 7-11; A.R. 3-7.

insight into how the government might treat the respondent[s] if he should return to Tanzania years after having been in the news for leaving a boy- scout jamboree in the United States and seeking asylum," and 2) "the ability of the respondent[s'] famil[ies] to continue to live in Tanzania without adverse action by the government greatly diminishes the likelihood that [they] will face harm if he should return." The BIA also concluded, as had the IJ, that respondents' claim "that the Tanzanian government may persecute [them] for embarrassing the government is not supported by the State Department's *Country Reports on Human Rights Practices* for 2007."[3]

The BIA decision proceeded as follows:

> The respondent disputes the [IJ's] determination that he did not establish the objective component of his asylum claim, i.e., that a reasonable person in his circumstances would fear persecution on account of a protected ground if returned to Tanzania. The respondent cites to a Third Circuit decision in the case of a fellow boy scout who had left the jamboree with the respondent and who also applied for asylum based on a fear of retaliation from the Tanzanian government. *See Lusingo v. Gonzales*, 420 F.3d 193 (3d Cir. 2005). In *Lusingo*, the . . . Third Circuit found that the Board erred in dismissing the respondent's, and his experts', analogy to street children who are repressed due to the embarrassment they cause the Tanzanian government and also erred in attaching significance to the fact that the Tanzanian government had not retaliated against Lusingo's parents. As a result, the court found that the Board's conclusion that Lusingo did not have an objectively reasonable fear of persecution was not supported by substantial evidence, and the court remanded to the Board. The Board issued a decision on December 8, 2005, stating that pursuant to the Third Circuit's decision, and upon further review of the record, we found Lusingo eligible for asylum and remanded the record for the completion of a background check.

> The respondent cannot succeed by relying on precedent from a jurisdiction outside that of the . . . Sixth Circuit or by relying on an unpublished Board decision, particularly one which was issued pursuant to a remand by a court in another jurisdiction. *See Matter of Anselmo*, 20 I&N Dec. 25, 31 (1989) (stating that "[w]here we disagree with a court's position on a given issue, we decline to follow it outside the

---

[3]BIA decision of June 2, 2009; J.A. 8, 9, 10.

court's circuit"); *Matter of Zangwill*, 18 I&N Dec. 22 (BIA 1982) (finding that an unpublished Board decision is not binding in other cases). Moreover, we agree, with the [IJ], for the reasons stated in her decision, that the respondent has not met his burden of establishing the objective component of his asylum claim. In this regard, we find the [IJ's] reasoning in determining that the circumstances of student demonstrators and street children in Tanzania are entirely distinct from the respondent's circumstances such that they are not particularly useful in determining how the Tanzanian government might treat the respondent upon his return to be more persuasive than the Third Circuit's analysis of this issue.

The Third Circuit in *Lusingo* found that the Board had "misinterpreted" Lusingo's evidence about street children because Lusingo "merely introduced evidence of the Tanzanian government's repressive attitude toward street children because they are an embarrassment to the Tanzanian government, and because the government's retaliation for the embarrassment they cause is relevant to the reasonableness of Lusingo's fear that he will be persecuted upon his return because he also embarrassed the government." *Lusingo v. Gonzales, supra*, at 200. However, we agree with the [IJ] that the Tanzanian government's poor treatment of street children or of student demonstrators provides little insight into how the government might treat the respondent if he should return to Tanzania years after having been in the news for leaving a boy scout jamboree in the United States and seeking asylum. As pointed out by the [IJ], the vague category of "individuals who have embarrassed the government" is so broad and can cover so many different behaviors and circumstances that the government's treatment of one individual or group of individuals who engage in behavior which may be viewed as embarrassing to the government is not necessarily instructive as to how others who "embarrass" the government in another manner may be treated.

Additionally, we are not convinced that the government's methods of trying to clear the cities of street children, who expert Dr. Rakesh Rajani acknowledged harass motorists stopped at red lights, beg for money, and sleep in the streets, by detaining them without charge or forcibly relocating them are motivated solely or even principally by the government's desire to "retaliate" against individuals whom it considers an embarrassment, rather than a desire to maintain order, control crime, and prevent harassment of other city residents. The record does not indicate that the Tanzanian government arrests or detains former street children, or former student demonstrators, in retaliation for having embarrassed the government in the past. Finally, street children are a particularly vulnerable group in view of their age and their general lack of family ties or connections with anyone who could advocate on their behalf. [Discussion of respondents' immediate family members living in Tanzania, their parents' employment, and siblings attending school there.]

Additionally, we agree with the [IJ] that the ability of the respondent's family to continue to live in Tanzania without adverse action by the government greatly diminishes the likelihood that he will face harm if he should return. See Matter of A-E-M, 21 I&N Dec. 1157 (1998) (reasonableness of alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure). The respondent acknowledged that his father paid the scoutmaster to allow him to stay in the United States so that he could pursue educational opportunities in this country. [Discussion of individual respondents' family members not having had serious problems with the government.]

Like the [IJ], we find it "difficult to believe that the government of Tanzania would fail to reach the common sense conclusion that the parents of the 15-17 year old Boy Scouts may have had some input in their decision to remain in the United States". This is especially true where a news report cites a Tanzania Scouts Association official acknowledging that the decision not to return may have been "made in conjunction with the parents," and more recent news reports indicate that in the years following the respondent's departure from the Jamboree, a large number of Tanzanian scouts have failed to return to Tanzania after attending international scouting events. Indeed, recent reports implicate the same scoutmaster (identified as a TSA commissioner) who had arranged for the respondent's travel in a scheme involving the sale of invitations to international scouting events to families of youths who are willing to pay for the opportunity to have their children leave Tanzania and then remain outside their country once the event is over. The record contains no evidence that any TSA officials, parents of scouts, or scouts themselves have been subjected to persecution as a result of having participated in this arrangement. We find implausible, and not supported by evidence, the notion that the Tanzanian government may persecute the scouts who, as children, remained in the United States pursuant to an arrangement made by their parents and a scoutmaster while not seeking any repercussions at all against the adults responsible for the arrangement.

Additionally, we agree with the [IJ] that the respondent's claim that the Tanzanian government may persecute him for embarrassing the government is not supported by the State Department's Country Reports on Human Rights Practices for 2007 (hereinafter *Country Reports*). The *Country Reports* indicate that there were no politically motivated killings by the government or its agents, no reports of political prisoners or detainees, and no reports of politically motivated disappearances. Political opponents are allowed unrestricted access to the media, and "there were numerous instances of strong criticism of national leaders in the press".

We agree with the [IJ] that the respondent did not meet his burden of establishing that a reasonable person in his position would fear persecution on account

of his race, religion, nationality, membership in a particular social group, or political opinion if returned to Tanzania. Therefore, he has not established the basis for an asylum claim . . . . Accordingly, the appeal will be dismissed.

[BIA decision June 2, 2009 at 2-5; J.A. at 8-11 (internal citations to record omitted).]

**IV**

Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination. To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision. Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the INA and accompanying regulations. The BIA's interpretation of the statute and regulations will be upheld unless the interpretation is arbitrary, capricious, or manifestly contrary to the statute.

This Court reviews both the immigration judge's and the BIA's factual findings under the substantial-evidence standard. We cannot reverse such findings simply because we would have decided them differently. These findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.

*Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal citations and quotations omitted).

The Attorney General has discretion to grant asylum to a person who qualifies as a "refugee" within the meaning of section 1101(a)(42)(A) of the Immigration and Nationality Act (INA). *Abay v. Ashcroft*, 368 F.3d 634, 636 (6th Cir. 2004) (citing 8 U.S.C. § 1158(b)(1)). The INA defines a refugee as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular group, or political opinion . . . . "

11

INA § 1102(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). The asylum applicant bears the burden of establishing that he qualifies as a refugee either because he has suffered past persecution or he has a well-founded fear of future persecution. *Abay*, 368 F.3d at 636-37.

Petitioners in the instant case asserted only future persecution, which requires an applicant to establish that:

> (1) he [] "has a fear of persecution in his [] country of nationality . . . on account of [] membership in a particular social group, or political opinion;" (2) "There is *a reasonable possibility of suffering such persecution* if he [] were to return to that country;" and (3) "He [] is unable or unwilling to return to, or avail himself [] of the protection of, that country because of such fear."

*Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (quoting 8 C.F.R. § 1208.13(b)(2)(i)) (emphasis added). "A well-founded fear of persecution does not require the applicant to show that he probably will be persecuted if he is deported; 'one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Perkovic v. INS*, 33 F.3d 615, 629 (6th Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).

### A

Petitioners argue that the prior BIA and Third Circuit holdings in *Lusingo* under substantively identical facts are correct and should be followed here, in keeping with the BIA's own policy of treating similarly-situated aliens similarly. We agree.

We note that petitioners acknowledged below that the Third Circuit's *Lusingo* decision is not binding in this Circuit.[4] Nor is the BIA's unpublished order in *Lusingo* following remand from the Third Circuit binding here; the BIA is bound only by prior BIA decisions deemed precedential, i.e., published. *See* 8 C.F.R. § 1003.1(g), (i). Nonetheless, we agree with petitioners that the BIA's denial

---

[4]Closing Arguments for November 1, 2006 Asylum Hearings at 18; A.R. 1768.

of their asylum applications in the face of its grant of Lusingo's application violated the fundamental legal principle – and the BIA's own policy[5] – that similarly-situated individuals should be treated similarly. Both the IJ and BIA acknowledged that petitioners' cases were "almost factually identical" to Lusingo's. Courts have noted that "administrative agencies must apply the same basic rules to all similarly situated supplicants," *Henry v. I.N.S.*, 74 F.3d 1, 6 (1st Cir. 1996), and "[t]he INS must give each asylum case individualized scrutiny, but it is a foundation of the rule of law that similarly situated individuals be treated similarly . . . ."). *Njuguna v. Ashcroft*, 374 F.3d 765, 771 n.4 (9th Cir. 2004), *see also Zhang v. Gonzales*, 452 F.3d 167, 173 (2d Cir. 2006) ("[I]t is a fundamental principle of justice that 'similarly situated individuals be treated similarly.") (citing *Njuguna*, 374 F.3d at 771 n.4).

In any event, as discussed below, we conclude that the determination that petitioners were ineligible for asylum was not supported by reasonable, substantial, and probative evidence on the record considered as a whole. *See Mikahilevitch v. I.N.S.*, 146 F.3d 384, 388 (6th Cir. 1998).

**B**

Petitioners argue that after concluding that they had a subjectively-genuine fear of persecution, the BIA erred in denying their asylum claims as objectively unreasonable by supplanting expert and fact witness testimony with its own non-expert opinion based on an alleged absence of persecution of persons not similarly situated with petitioners. Again, we agree.

The BIA noted in this regard:

---

[5]*See e.g., In re L-G-*, 21 I. & N. Dec. 89, 101 (BIA 1995), criticized on other grounds in cases including *Casarez-Gutierrez v. Ashcroft*, 356 F.3d 1015 (9th Cir. 2004).

> The record does not indicate that the Tanzanian government arrests or detains former street children, or former student demonstrators, in retaliation for having embarrassed the government in the past," and "[t]he record contains no evidence that any TSA officials, parents of scouts, or scouts themselves have been subjected to persecution . . . We find implausible, and not supported by the evidence, the notion that the Tanzanian government may persecute the scouts who, as children, remained in the United States pursuant to an arrangement made by their parents and a scoutmaster while not seeking any repercussions at all against the adults responsible for the arrangement.[6]

Given that petitioners' experts Rajani and Landau were found credible and their declaration and affidavit, which were essentially the same as they provided in *Lusingo*,[7] were uncontroverted, we find the BIA's reasoning difficult to comprehend. The IJ and BIA substituted speculation for expert testimony in finding that the Tanzanian government's poor treatment of street children and student demonstrators is "largely irrelevant" (IJ at 16; J.A. 105) and "provides little insight" (BIA at 3; J.A. 9) into how the government would treat the three petitioners, as well as in finding that it would be "implausible and not supported by evidence" for the Tanzanian government to persecute petitioners while not persecuting TSA officials, parents of the scouts, or scouts themselves. No evidence was presented of any boy scout returning home to Tanzania in circumstances like petitioners'. As to TSA officials, the scouts presented expert evidence that the TSA and Tanzanian government are intertwined. Even if it were the case that the government did not persecute TSA officials, that is of little relevance to the question whether the government would persecute three of the four scouts

---

[6]J.A. 10.

[7]*See* Rajani Declaration, A.R. 1646-54; Landau affidavit, A.R. 1384-86. Petitioners also presented a declaration of Richard Shilamba, a lawyer in Tanzania familiar with the human rights situation and refugee issues in Tanzania, J.A. 376-78.

14

whose names were published in the press as seeking asylum in the United States, and who, according to Dr. Rajani, "commanded media attention" in Tanzania like no other individual case of recent memory and were referred to as traitors in the press. Finally, that petitioners' parents had apparently not been persecuted by the government after petitioners sought asylum is of little weight because the parents were not similarly situated or subject to risk similar to petitioners. *Yang Lin v. Holder*, 320 F. App'x 428, 435 n.5 (6th Cir. 2009) ("ongoing safety of family member in petitioner's country of origin undermines an application for asylum when family members are 'similarly situated' and are 'subject to similar risk'") citing *Lim v. INS*, 224 F.3d 929, 935 (9th Cir. 2000)). Put another way, "the fact that family members continue to reside unharmed in the home country may carry little evidentiary weight if they do not share the trait that made the petitioner a target of persecution." *See Sok v. Mukasey*, 526 F.3d 48, 57 (1st Cir. 2008). There was no evidence that any of petitioners' family members living in Tanzania spoke against or in any way embarrassed the Tanzanian government, or expressed a negative political opinion, much less left the country and sought asylum elsewhere.

The IJ and BIA also found that the State Department's 2007 Country Reports on Human Rights Practices in Tanzania did not support petitioners' claim. As noted by the IJ/BIA, the report states that there were no politically-motivated killings or reports of politically-motivated disappearances, that political opponents are allowed unrestricted access to the media, and that there were numerous instances of strong criticism of national leaders in the press.

However, the 2007 Report also states that "on several occasions security forces used lethal force against citizens, including persons in custody," "Police and prison guards used excessive force against inmates or suspects, at times, resulting in death," and that prison conditions "remained harsh

15

and life threatening. Diseases were common and resulted in numerous deaths in prisons . . . the leading causes . . . were malaria, tuberculosis, HIV/AIDS, cholera, and diseases related to poor sanitation." Further, the report noted, "the government acknowledged severe problems of overcrowding, lengthy pretrial detention of prisoners, and holding juveniles together with adult prisoners." The report recognized that "The constitution prohibits arbitrary arrest and detention; however, both were problems." Regarding freedom of speech and the press, the report noted that government restrictions on freedom of speech "have eased" under the Kikwete administration. Finally, the report stated regarding government corruption and transparency, "Despite improvements in the past decade, corruption remained a pervasive problem throughout the government . . . . There was little accountability in most government entities." A.R. 680-702.

The BIA relied on a select few portions of the Country Report in finding that the Report did not support petitioners' asylum applications. The Report as a whole does not undermine petitioners' claim of future persecution. The 2007 Report does indicate that there were improvements in certain areas since the early 2000s;[8] however, when read as a whole, these few incremental advances do not suggest that persons who embarrass the Tanzanian government in the international press would be less harshly treated than petitioners' experts attested.

---

[8] *See* 2001 Country Report, Pet'rs Suppl. App. at 1301.

16

### C

Finally, we consider the Government's claim that the administrative decisions are supported by substantial evidence because petitioners admitted they failed to produce evidence supporting an objective basis for their fear of persecution.

At the November 2006 removal proceedings, petitioners were asked whether they had documentary evidence to corroborate that, despite the passage of more than five years since they left the Jamboree, they would be persecuted if returned to Tanzania. The scouts testified that nothing had changed in Tanzania and that persons who were deported or returned to Tanzania were jailed. Although the scouts provided no additional documentary evidence,[9] their experts' affidavits and declarations corroborated that their fear of future persecution was objectively reasonable. Petitioners' experts' affidavits and declarations strongly supported that there is a high likelihood that petitioners would be persecuted if returned to Tanzania. The Government presented no contrary expert evidence, and its claim that petitioners failed to produce evidence supporting that they objectively feared persecution fails.

### V

We conclude that the determinations that petitioners were ineligible for asylum and presented insufficient corroborative evidence are unsupported by reasonable, substantial, and probative evidence on the record considered as a whole. *See Mikhailevitch*, 146 F.3d at 388. Accordingly, we remand to the BIA for further proceedings consistent with this opinion.

---

[9] *See* 11/1/06 Hrg - A.R. 654-56 (Kiegemwe); 535-36, 545-48, 552 (Tembo); 581-82, 596-97, 600-601 (Luambano).

17

**Julia Smith Gibbons, Circuit Judge, concurring.** I fully concur with the conclusions of the majority opinion but write separately to emphasize a couple of points that are particularly important to my reasoning.

First, the record in these cases consists only of evidence presented by Kiegemwe, Luambano, and Tembo. Thus, when the BIA and the IJ concluded that the appellants had not established that a reasonable person in their circumstances would fear persecution if returned to Tanzania, they did not do so based on evidence contrary to that presented by appellants. And appellants without question presented evidence that supported the objective component of their asylum claims. Given this record, examination of the reasoning utilized by the BIA in rejecting the claims is critical to ascertaining whether the BIA's findings are supported by substantial evidence and whether any reasonable adjudicator would be compelled to conclude to the contrary.

The BIA's analysis largely consisted of rejecting an analogy made by appellants' expert and embracing an analogy of its own. Initially, the BIA found inapt the petitioners' analogy to street children of Tanzania who suffer government retaliation for causing embarrassment. The BIA, however, was careful not to "misinterpret" the analogy to street children as the Third Circuit determined it had in Lusingo's case. Rather than rejecting the analogy because petitioners were not street children, as it had done previously, the BIA rejected the analogy to "individuals who have embarrassed the government" as too broad to be persuasive. Then, the BIA found apt an analogy to the petitioners' parents who had suffered no consequence from the petitioners' actions. The Third Circuit specifically concluded that lack of consequence to the parents was insignificant in Lusingo's

18

case. But the BIA failed to comprehend what the Third Circuit recognized—that petitioners' parents were in a very distinct position from petitioners.

Despite its discussion of the analogies to street children and to petitioners' parents, the BIA rejected the most instructive analogy available—Lusingo. This is not to say that the BIA was required to follow the Third Circuit's precedent. *See Mirditaj v. Ashcroft*, 116 F. App'x 733, 735 (6th Cir. 2004) ("While '[t]he BIA is required to follow court of appeals precedent within the geographical confines of the relevant circuit,' the precedent of the [outside circuit] is not binding on the BIA in a case originating within the Sixth Circuit."); *see also De la Rosa v. U.S. Att'y Gen.*, 579 F.3d 1327, 1336 (11th Cir. 2009) ("[R]eliance on unpublished BIA decisions is misplaced as the BIA accords no precedential value to its unreported decisions." (citing *Matter of Zangwill*, 18 I. & N. Dec. 22, 27 (BIA 1981))). Still, given its analytic approach, the BIA's failure to deal with the identical circumstances of Lusingo and the appellants before us now is puzzling.

Like the Third Circuit in *Lusingo*, we find the BIA's reasoning unsound—so unsound that it cannot be said to be based on substantial evidence. Indeed, all the evidence points to a conclusion that appellants did establish the objective component of their asylum claims, and the BIA's reasoning fails to justify its rejection of the evidence. Under these circumstances, any reasonable adjudicator would be compelled to agree that appellants had supported their claim.

Second, the BIA's failure to explain its differential treatment of Lusingo and the appellants before us is troubling. The BIA has recognized the principle that similarly situated applicants for asylum are to be treated similarly, *see Perkovic v. I.N.S.*, 33 F.3d 615, 621 (6th Cir. 1994), but in this case nearly identical applicants received opposite results. In 2005, after the Third Circuit's reversal

19

of the original BIA decision, Fikiri Lusingo was granted asylum. The only material distinction between the petitioners today and Lusingo then is the passage of time. Indeed, the arguments brought before the Third Circuit hardly differ from those before our court. Surely, responsible consideration of these claims would have required the articulation of some basis for differentiation other than a reminder that the BIA was not required to follow the Third Circuit. One would hope that in the future the BIA might seek consistency of result in keeping with fundamental fairness.

**Paul L. Maloney, District Judge, concurring.** I fully concur with Judge White's opinion.

I write separately to join Judge Gibbons' poignant observations concerning the Department of Justice's litigation stance in the instant cases.

Mr. Lusingo was granted asylum by the BIA nearly six years ago. Surely, the mere happenstance that appellants remained in Michigan and Lusingo moved to the Commonwealth of Pennsylvania ought make no difference on a matter as grave as nearly identical asylum petitions. Perkovic v. I.N.S., 33 F3d 615, 621 (6th Cir. 1994). Recognizing that these decisions are solely reserved to the sound exercise of discretion of the Executive Branch, so it is.